SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| In the matter of the application of<br><br>THE BANK OF NEW YORK MELLON (as Trustee under various Pooling and Servicing Agreements and Indenture Trustee under various Indentures),<br><br>      Petitioner,<br><br>        -against-<br><br>WALNUT PLACE LLC; WALNUT PLACE II LLC; WALNUT PLACE III LLC; WALNUT PLACE IV LLC; WALNUT PLACE V LLC; WALNUT PLACE VI LLC; WALNUT PLACE VII LLC; WALNUT PLACE VIII LLC; WALNUT PLACE IX LLC; WALNUT PLACE X LLC; and WALNUT PLACE XI LLC (proposed intervenors),<br><br>      Respondents,<br><br>for an order pursuant to CPLR § 7701 seeking judicial instructions and approval of a proposed settlement. | Index No. 651786/2011<br><br>Assigned to: Kapnick, J.<br><br>**NOTICE OF PETITION TO INTERVENE** |

      PLEASE TAKE NOTICE that, upon the affirmation of Owen L. Cyrulnik dated July 5, 2011, the petition of the Trustee, the petition filed herewith, and all previous papers and proceedings in this proceeding, the proposed intervenors listed below (referred to as Walnut Place) will move this Court on July 13, 2011, at 9:30 a.m. or as soon thereafter as counsel may be heard, for an order pursuant to CPLR 401, 1012, and 1013 permitting Walnut Place LLC, Walnut Place II LLC, Walnut Place III LLC, Walnut Place IV LLC, Walnut Place V LLC, Walnut Place VI LLC, Walnut Place VII LLC, Walnut Place VIII LLC, Walnut Place IX LLC, Walnut Place X LLC, and Walnut Place XI LLC to intervene as respondents in this proceeding, directing that the Walnut Place entities be added as respondents, directing that the Trustee's petition and notice of petition be amended by adding the Walnut Place entities as intervenors-respondents, and granting such other and further relief as may be just, proper, and equitable.

- 2 -

PLEASE TAKE FURTHER NOTICE that, pursuant to CPLR 403(b), answering papers, if any, must be served on the undersigned no later than two days before the return date of this motion.

Dated: New York, New York
      July 5, 2011

                          GRAIS & ELLSWORTH LLP

*/s/ David J. Grais*

By:_____
    David J. Grais
    Owen L. Cyrulnik
    Leanne M. Wilson

40 East 52nd Street
New York, New York 10022
(212) 755-0100
(212) 755-0052 (fax)

Attorneys for Proposed Intervenor-Respondents

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| In the matter of the application of<br><br>THE BANK OF NEW YORK MELLON (as Trustee under various Pooling and Servicing Agreements and Indenture Trustee under various Indentures),<br><br>   Petitioner,<br><br>    -against-<br><br>WALNUT PLACE LLC; WALNUT PLACE II LLC; WALNUT PLACE III LLC; WALNUT PLACE IV LLC; WALNUT PLACE V LLC; WALNUT PLACE VI LLC; WALNUT PLACE VII LLC; WALNUT PLACE VIII LLC; WALNUT PLACE IX LLC; WALNUT PLACE X LLC; and WALNUT PLACE XI LLC (proposed intervenors),<br><br>   Respondents,<br><br>for an order pursuant to CPLR § 7701 seeking judicial instructions and approval of a proposed settlement. | Index No. 651786/2011<br><br>Assigned to: Kapnick, J.<br><br>**VERIFIED PETITION TO INTERVENE** |

   For their petition pursuant to CPLR 401, 1012, and 1013 to intervene as respondents in this proceeding, which seeks the Court's approval of a settlement by which 22 self-appointed investors, many of which have extensive other business relationships with Bank of America Corporation and its subsidiaries, and a trustee that likewise has serious conflicts of interest, would extinguish the legal rights of hundreds of other investors, including the proposed intervenors, proposed intervenors Walnut Place LLC, Walnut Place II LLC, Walnut Place III LLC, Walnut Place IV LLC, Walnut Place V LLC, Walnut Place VI LLC, Walnut Place VII LLC, Walnut Place VIII LLC, Walnut Place IX LLC, Walnut Place X LLC, and Walnut Place XI LLC state and allege:

   1.  To continually raise new money with which to make its now-notorious mortgage loans to borrowers across the United States, Countrywide Home Loans, Inc. and its affiliates sold millions of its loans to securitization trusts that Countrywide sponsored. To raise the money to pay Countrywide for the mortgage loans, those trusts in turn sold securities called certificates,

which were backed by those mortgage loans, to investors all over the world. To assure the trusts and investors that the loans it was selling them were of good quality, Countrywide made numerous representations and warranties about those loans. And to put teeth into those representations and warranties, Countrywide agreed to repurchase from the trusts loans that did not comply with the representations and warranties.

2. The Walnut Place entities own securities issued by three of Countrywide's trusts. Concerned by widespread reports about the poor quality of Countrywide's loans, Walnut Place spent many months and hundreds of thousands of dollars to investigate the true quality of the loans in three of those trusts. It found that hundreds of loans in each trust were actually not of good quality and breached several of the representations and warranties that Countrywide had made about them.

3. The Bank of New York Mellon is the trustee for 530 of the trusts that Countrywide created, including all three of the Countrywide trusts that issued the certificates that Walnut Place owns.

4. On August 3, 2010, almost a year ago, Walnut Place presented to BNYM the detailed evidence that it uncovered in its investigation of one of those three trusts, Alternative Loan Trust 2006-OA10 (referred to as OA10). That evidence proved that many of the loans in that trust breached the representations and warranties that Countrywide had made about them. Walnut Place demanded that Countrywide repurchase those loans as it had agreed. When it refused, Walnut Place and other investors – which collectively owned more than 25% of the voting rights in that trust – demanded that BNYM sue Countrywide to enforce its promise to repurchase the defective loans. As it has in many cases in which it has been presented with evidence of Countrywide's breaches, BNYM did nothing. On February 23, 2011, Walnut Place then filed an action in this Court, derivatively on behalf of the OA10 Trust, to enforce Countrywide's obligation to repurchase the defective loans.

5. Walnut Place conducted the same investigation and made the same demands with respect to two other trusts. On April 12, 2011, Walnut Place amended its complaint to add Alternative Loan Trust 2006-OA3 (referred to as OA3). And Walnut Place has already begun to prepare a lawsuit on a third trust, Alternative Loan Trust 2006-OA21.

6. Months after Walnut Place filed its action in this Court, BNYM announced on June 29, 2011, that it had entered into an agreement with Countrywide and its corporate parent and successor by *de facto* merger, Bank of America Corporation,[1] to settle all "potential claims belonging to the [530] trusts" for which BNYM serves as trustee. On the same day, BNYM filed this Article 77 proceeding to request judicial approval of the proposed settlement. BNYM requested assignment of its proceeding to Justice Kapnick on the ground that its petition is related to Walnut Place's lawsuit. (*See* BNYM Request for Judicial Intervention ("if approved, the Settlement will resolve the claims raised by the plaintiffs in *Walnut Place LLC*.").)

7. The terms of the proposed settlement would release the claims of all 530 trusts for breaches of representation and warranties against Countrywide and Bank of America. Although BNYM concedes (BNYM Petition ¶ 13, 15) that it knew that Walnut Place and other certificateholders were likely to object to the proposed settlement, BNYM nevertheless made no effort to inform Walnut Place or the hundreds of investors in Countrywide trusts other than the 22 self-appointed investors that BNYM was secretly negotiating a deal with Countrywide and Bank of America, much less to solicit the views of those investors about what terms of settlement would be fair or whether they wished to be "represented" in those negotiations by the 22 self-appointed investors.[2]

---

[1] On January 11, 2008, Bank of America Corporation agreed to acquire Countrywide Financial Corporation (the parent company of Countrywide Home Loans) in a reverse triangular merger. The transaction closed on July 1, 2008, and on October 6, 2008, Bank of America announced that Countrywide would transfer all or substantially all of its assets to unnamed subsidiaries of Bank of America. Walnut Place elaborates on these facts in paragraphs 154-176 of its amended complaint in *Walnut Place LLC v. Countrywide Home Loans, Inc.*, Index No. 650497/2011 (Sup. Ct. N.Y. County) (attached as Exhibit A).

[2] Bank of America stated publicly that it was negotiating with certain investors about specific trusts in which those investors owned 25% or more of the voting rights. Those trusts did not include any of the three

8. In short, despite the fact that BNYM owes at least the same duties to Walnut Place that it owes to every other certificateholder in the 530 Countrywide-sponsored trusts, BNYM is asking this Court to approve a settlement that it negotiated in secret and that would release Walnut Place's claims without its consent while it is in the middle of an active litigation, which it brought on behalf of all cerificateholders in the OA10 ad OA3 Trusts when BNYM failed to do so.

9. On June 29, 2011, BNYM appeared *ex parte*, without notice to any potentially adverse parties like Walnut Place, and obtained from this Court an Order to Show Cause that sets forth a procedure for the approval of the proposed settlement.

10. BNYM did not name any adverse parties when it filed this proceeding, but its petition expressly contemplates that adverse parties may be added. "There currently are no adverse parties in this proceeding. To the extent that certain Certificateholders or other interested parties may wish to be heard on the subject of the Settlement or the judicial instructions sought through this Petition, those parties may become adverse." (BNYM Petition ¶ 18.)

11. Walnut Place is directly affected by this proceeding and seeks to intervene for at least two reasons. First, Walnut Place intends to ask the Court to provide a mechanism to permit certificateholders to exclude their trusts from the proposed settlement. Second, Walnut Place has serious concerns about the secret, non-adversarial, and conflicted way in which the proposed settlement was negotiated and about the fairness of the terms of the proposed settlement. If Walnut Place is not permitted to exclude the OA10, OA3, and OA21 Trusts from the proposed settlement, then Walnut Place will seek the necessary disclosure to evaluate these concerns and to bring them and the facts that support them to the attention of the Court. Walnut Place must seek this relief by intervening as a party because the procedures provided by the Order to Show

---

trusts in which Walnut Place owns certificates. Moreover, neither Bank of America nor BNYM ever disclosed that BNYM was participating in negotiations to release the rights of all certificateholders in 530 Countrywide trusts.

Cause that BNYM proposed and obtained are wholly inadequate to protect the interests of certificateholders other than the 22 self-appointed investors.

        **A.**      **The Settlement Agreement and the Order to Show Cause Do Not Provide a Clear Mechanism for Excluding Trusts From the Proposed Settlement.**

12.      Section 4(a) of the Settlement Agreement, which is attached as Exhibit B to BNYM's petition, expressly contemplates that one or more trusts may be excluded from the proposed settlement. Section 4(b) of the agreement even provides that Bank of America and Countrywide may scuttle the entire settlement if the unpaid principal balance of "Excluded Trusts" exceeds a certain "confidential percentage" of the total unpaid principal balance of all 530 trusts.

13.      But neither the Settlement Agreement nor the Order to Show Cause provides any mechanism for certificateholders in a particular trust to elect to exclude that trust from the settlement. Indeed, certificateholders have no rights whatsoever under the Order to Show Cause except to submit "written objections" to the proposed settlement. The Order to Show Cause states that those objections will be heard on November 17, 2011, the same day on which the Court is to consider whether to approve the proposed settlement.

14.      It is unreasonable to expect certificateholders to wait until the final approval hearing on November 17 before knowing what conditions they must satisfy to exclude their trusts from the proposed settlement and whether they have fulfilled those conditions. At the very least, certificateholders that object to the settlement must have sufficient notice that their request to be excluded has been denied so as to permit them to challenge the settlement in other ways.

15.      Walnut Place intends to file a motion to modify the Order to Show Cause to provide – well in advance of the hearing on November 17 – a clear mechanism for a certain percentage of the certificateholders in any trust to "opt out" of the proposed settlement on behalf of that trust.

### B. The Settlement Agreement and the Order to Show Cause Do Not Provide Enough Time for Certificateholders to Bring to the Attention of the Court their Serious Concerns about the Fairness of the Settlement.

16. Walnut Place has serious concerns about the fairness of the proposed settlement and the process by which it was negotiated. If Walnut Place cannot exclude the OA10, OA3, and OA21 Trusts from the proposed settlement, then, by intervening as a party in this proceeding, Walnut Place will have standing to seek disclosure to develop the information necessary to bring these concerns and the facts behind them to the attention of the Court. Moreover, Walnut Place respectfully submits that adverse certificateholders cannot possibly be expected to obtain the necessary disclosure and evaluate the proposed settlement in time to file objections in August and be ready for a hearing in November. BNYM, Bank of America, Countrywide, and the 22 self-appointed investors took many months to negotiate this proposed settlement and had unlimited access to the information with which to do so. Walnut Place intends to seek a modification of the Order to Show Cause to permit a reasonable time for adverse certificateholders to gather through disclosure the information necessary to evaluate the fairness of the settlement, and then to present that information to the Court before the Court decides whether to approve the proposed settlement.

17. Below are a few of many questions that Walnut Place believes must be answered about the fairness of the proposed settlement and the process by which it was negotiated.[3]

#### a. BNYM's conflicts of interest

18. BNYM negotiated the proposed settlement in secret, without soliciting the reviews of certificateholders other than the 22 self-appointed investors discussed below. In doing so, BNYM ignored established procedures that trustees of similar trusts have followed to solicit the views of certificateholders before taking action on behalf of a trust.

---

[3] Moreover, even if the settlement were reasonable, BNYM's proposal to release the rights of hundreds of certificateholders through an Article 77 proceeding is without precedent. Walnut Place has not yet had enough time to study the legal issues but reserves the right to argue that BNYM is misusing Article 77. Nor is it clear that BNYM even has the legal authority under the PSAs unilaterally to settle and release all of the rights of the trusts for breaches of the representations and warranties without at least soliciting the approval of all certificateholders in each trust.

19.     BNYM purports to have the right to bind all trusts and all investors to this settlement. But BNYM has at least three conflicts of interest that raise serious doubts about its motives in negotiating the settlement.

20.     *First*, under the Pooling and Servicing Agreements, BNYM is indemnified by the Master Servicer of each trust, Countrywide Home Loans Servicing, LP (another predecessor-in-interest of Bank of America Corporation), for costs and liabilities that arise out of certain duties that BNYM is to perform for the trusts. As part of the proposed settlement, BNYM negotiated for itself an indemnity from Countrywide that goes well beyond the scope of the indemnity that BNYM is otherwise entitled to under the PSAs. In particular, Countrywide agreed to indemnify BNYM for all costs and liabilities that BNYM may incur as a result of its participation in the very unusual process of negotiating the proposed settlement. This expanded indemnity is embodied in a "side letter" to the Settlement Agreement. It is very unusual, to say the least, for a trustee that says it is representing the interests of the beneficiaries of a trust, to demand and obtain an indemnity from the very party that is adverse to that trust and its beneficiaries (in this case, the certificateholders). BNYM concedes in its petition that it was concerned about its liability for the way in which it was handling (or, more accurately, ignoring) the demands of its beneficiaries that it take legal action for their benefit against Countrywide and Bank of America. For example, BNYM referred to "reports that a group of Certificateholders has considered taking action against BNY Mellon for its participation in the Settlement process." (BNYM Petition ¶ 13.) BNYM also states that "the Trustee also may be subject to claims by individual Certificateholders who believe that the Settlement, though benefiting thousands of Trust Beneficiaries now and in the future, may not be in their individual best interests." (BNYM Petition ¶ 15.) The proposed settlement protects BNYM from these liabilities by means of an indemnity from the party against which it was supposed to protect the interests of its beneficiaries and now anticipates that it may be liable for its failure to do so.[4]

---

[4] Walnut Place also has serious doubts about the validity of the indemnity agreement. The Court of Appeals has held that indemnity agreements that purport to provide indemnification for punitive damages are

- 7 -

21. *Second*, under the PSAs, BNYM is indemnified solely by Countrywide Home Loans Servicing, yet the parent and successor of that entity, Bank of America Corporation, guaranteed that indemnity to BNYM. The guarantee does nothing for the trusts or the certificateholders, but it provides a great benefit to BNYM. Indeed, BNYM states expressly in its petition that it doubts the solvency of Countrywide, so much so that it argues that Countrywide's supposed inability to pay a large judgment is a reason to accept the proposed settlement. (*Id.* ¶¶ 78-81.) Thus, the guarantee from Bank of America puts BNYM in a substantially better position than it was in before negotiating the proposed settlement, at the direct expense of the certificateholders whose interests BNYM purports to protect.

22. *Third*, BNYM cannot objectively evaluate the fairness of the proposed settlement because BNYM has duties to – and (as BNYM itself acknowledges) is potentially liable to – the certificateholders of all 530 trusts. It is obviously in BNYM's own interest to "settle" the claims of all 530 trusts at the same time on substantially identical terms. Otherwise, BNYM could be liable to certificateholders that believe they were treated less favorably than others. But not all of the trusts are identically situated. For example, Walnut Place is the only certificateholder in any Countrywide trust that has yet invested the time and money to conduct an independent investigation and actually sue Countrywide and Bank of America for breaches of representations and warranties. (None of the 22 self-appointed investors has ever done so, despite their claim to represent the interests of other certificateholders.) If BNYM were not hopelessly conflicted, it would have insisted that the proposed settlement take into account the far greater recovery that all certificateholders in the OA10, OA3, and OA21 trusts can expect because of Walnut Place's diligence.

---

void as a matter of public policy. *See Zurich Insurance Co. v. Shearson Lehman Hutton, Inc.,* 84 N.Y. 2d 309, 316 (1994). Public policy also would prohibit a trustee that owes duties to the beneficiaries of a trust from enjoying an indemnity for the breach of those duties from a party that is adverse to the interests of those beneficiaries.

### b. The conflicts of interest of the 22 self-appointed investors

23. BNYM's petition and the Settlement Agreement state that a group of 22 investors was heavily involved in the negotiation of the proposed settlement. (BNYM Petition ¶ 35.) The Settlement Agreement specifically refers to these 22 investors – which apparently appointed themselves to represent the interests of hundreds of other investors in Countrywide-sponsored trusts – and requires that they intervene in this proceeding to support the proposed settlement. The Settlement Agreement and BNYM's petition omit to state, however, that many of these 22 investors have substantial ongoing business relationships with Bank of America other than their ownership of certificates in Countrywide-sponsored trusts. For example, BlackRock Financial Management, Inc., is one of the 22 investors. During the time in which the Settlement Agreement was being negotiated, Bank of America *owned* up to 34 percent of BlackRock. BlackRock announced an agreement to repurchase Bank of America's remaining stake on July 1, 2011, just two days after the settlement was announced. Moreover, during some of that same time, BlackRock was a large shareholder in Bank of America Corporation. Thus, just when BlackRock says it was negotiating at "arm's length" to settle the claims of hundreds of other certificateholders, it and Bank of America owned large parts of each other and it was negotiating its own deal to buy out Bank of America's remaining stake. Many other of the 22 investors also have substantial business dealings with Bank of America or its subsidiaries other than their ownership of certificates in Countrywide-sponsored trusts. At a minimum, certificateholders should be permitted to take the discovery necessary to illuminate and bring to the Court's attention the serious conflicts of interest among the 22 investors that appointed themselves to represent the interests of hundreds of others.

### c. The inadequacy of BNYM's evaluation of the proposed settlement

24. Bank of America stated in its press release announcing the proposed settlement that the Countrywide mortgage loans in the 530 trusts currently have an unpaid principal balance

of $221 billion.[5] An additional $48 billion of loans have been liquidated from those trusts by foreclosure or similar procedures. Under the PSAs, Countrywide is required to repurchase defective loans even if they have been liquidated. Thus, the total principal value of loans that Countrywide could be required to repurchase is approximately $269 billion. Audits of Countrywide loan files have revealed that as many as 90% of those loans breached representations and warranties. Walnut Place's own analyses of the loans in the OA10 and OA3 Trusts, which were performed without Walnut Place even having access to the loan files themselves, found that 66% and 58% of those loans, respectively, breached representations and warranties. Thus, Countrywide may be liable to repurchase loans with unpaid principal balances of as much as $242 billion. The $8.5 billion that Countrywide and Bank of America have agreed to pay is therefore only a small fraction of the potential liability that they would have faced in litigation on behalf of the trusts.

25. To defend this inadequate settlement, BNYM states that it engaged unidentified "financial experts" who "analyzed the various ways in which a settlement payment could be calculated" and advised BNYM on what range of settlements they would consider reasonable. (BNYM Petition ¶ 64.) Neither the Settlement Agreement nor the Order to Show Cause provides any procedure for a certificateholder to gather the information necessary to conduct an independent analysis of the same facts that BNYM and its "financial experts" considered in concluding that the proposed settlement is reasonable. Moreover, BNYM does not even disclose whether it audited a sample of the origination files of the mortgage loans in any of the 530 trusts, a procedure approved by Justice Bransten in litigation against Countrywide to determine how many of the loans that it sold were in breach of representations and warranties. *MBIA Insurance Corp. v. Countrywide Home Loans, Inc.,* Index. No. 602825/2008, slip op. (Sup. Ct. N.Y. County Dec. 22, 2010) (attached as Exhibit B). The apparent omission of that obvious step itself casts serious doubt on BNYM's motives in agreeing to the proposed settlement.

---

[5] The press release is available at http://investor.bankofamerica.com/phoenix.zhtml?c=71595&p=irol-newsArticle_pf&ID=1580643.

### d.   Countrywide's ability to satisfy a judgment and Bank of America's liability as a successor to Countrywide

26.   BNYM argues that the proposed settlement is reasonable because "the Trustee has concluded that Countrywide will be unable to pay any future judgment that exceeds, equals or even approaches the Settlement Payment." (BNYM Petition ¶ 81.) BNYM also states that it believes there would be "obstacles to the Trustee of holding Bank of America liable for the alleged breaches by Countrywide." (*Id.* ¶ 92.) Without appropriate discovery, neither the Court nor certificateholders like Walnut Place have access to the necessary information to test the validity of those conclusions. But Justice Bransten's denial of Bank of America's motion to dismiss similar allegations against it, *MBIA Insurance Corp. v. Countrywide Home Loans, Inc.,* Index. No. 602825/2008, slip op. at 11-15 (Sup. Ct. N.Y. County Apr. 29, 2010) (attached as Exhibit C), the fact that Bank of America picks and chooses which of Countrywide's obligations it will honor or guarantee, and the fact that Bank of America is willing to pay $8.5 billion to settle liabilities that BNYM thinks that Bank of America does not even have, all suggest that BNYM is exaggerating the difficulty of holding Bank of America liable for Countrywide's obligations.

*

27.   For all of the reasons discussed above, Walnut Place respectfully submits that it and other certificateholders should be permitted the time and disclosure necessary to investigate, and then to bring to the attention of the Court these important concerns about the proposed settlement.

## RELIEF REQUESTED

Walnut Place respectfully requests that the Court grant Walnut Place's petition to intervene.

Dated: New York, New York
       July 5, 2011

>                                GRAIS & ELLSWORTH LLP
>
>                                */s/ David J. Grais*
>
>                                By:_____
>                                     David J. Grais (DG 7118)
>                                     Owen L. Cyrulnik
>                                     Leanne M. Wilson
>
>                                40 East 52nd Street
>                                New York, New York 10022
>                                (212) 755-0100
>                                (212) 755-0052 (fax)
>
>                                Attorneys for Proposed Intervenors-Respondents

## VERIFICATION

I, Owen L. Cyrulnik, hereby affirm under the penalty of perjury that the following is true and correct:

I am a member of the bar of this Court and of Grais & Ellsworth LLP, attorneys for proposed intervenors Walnut Place LLC, Walnut Place II LLC, Walnut Place III LLC, Walnut Place IV LLC¸ Walnut Place V LLC, Walnut Place VI LLC, Walnut Place VII LLC, Walnut Place VIII LLC, Walnut Place IX LLC, Walnut Place X LLC, and Walnut Place XI LLC. I have read the foregoing Verified Petition and know the contents thereof. All statements of fact therein are true and correct to the best of my knowledge and belief. I am making this affirmation in lieu of a verification by the proposed intervenors because the proposed intervenors are not within New York County, where Grais & Ellsworth LLP maintains its offices.

Executed this 5th day of July 2011, in New York, New York.

*[signature]*

_____
Owen L. Cyrulnik