UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the matter of the application of

THE BANK OF NEW YORK MELLON (as Trustee under various Pooling and Servicing Agreements and Indenture Trustee under various Indentures), *et al.*,

    Petitioners and Intervenor-Petitioners,

    -against-

WALNUT PLACE LLC, *et al.,*

    Intervenor-Respondents.

Docket No. 11-CV-5988 (WHP)

## WALNUT PLACE'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO THE BANK OF NEW YORK MELLON'S MOTION TO REMAND

GRAIS & ELLSWORTH LLP
40 East 52nd Street
New York, New York 10022
(212) 755-0100

Attorneys for Walnut Place LLC, Walnut Place II LLC, Walnut Place III LLC, Walnut Place IV LLC, Walnut Place V LLC, Walnut Place VI LLC, Walnut Place VII LLC, Walnut Place VIII LLC, Walnut Place IX LLC, Walnut Place X LLC, and Walnut Place XI LLC

September 27, 2011

## TABLE OF CONTENTS

**PAGE(S)**

TABLE OF AUTHORITIES ................................................................................................... ii

ARGUMENT ..........................................................................................................................2

I.    THIS ACTION INVOLVES CLAIMS THAT RELATE TO BNYM'S NON-WAIVABLE DUTY UNDER NEW YORK LAW TO AVOID CONFLICTS OF INTEREST........................................................................2

    A.    Every Trustee Has A Duty Under New York Common Law To Avoid Conflicts Of Interest..............................................................................2

    B.    The Securities Exception Does Not Apply Because This Action Involves Essential Claims That Arise Solely Under New York Law....................................3

        1.    The Question Whether BNYM Violated Its Duty To Refrain From Engaging In Conflicts Of Interest Is An Essential Claim In This Action..................................................................4

        2.    Walnut Place And Other Defendants Have Alleged Tangible Conflicts Of Interest That Further Underscore The Importance Of BNYM's Claims Under New York Law. ........................................................5

II.    THIS ACTION INVOLVES CLAIMS THAT RELATE TO BNYM'S POST-DEFAULT NON-WAIVABLE FIDUCIARY DUTY UNDER NEW YORK LAW ...........................................................................................7

CONCLUSION........................................................................................................10

## TABLE OF AUTHORITIES

PAGE(S)

### CASES

*AMBAC Indemnity Corp. v. Bankers Trust Co.*,
   151 Misc. 2d 334 (N.Y. Sup. Ct. 1991) ................................................................................2

*Beck v. Manufacturers Hanover Trust Co.*,
   218 A.D.2d 1(N.Y. App. Div. 1995) .....................................................................................8

*BNP Paribas Mortgage Corp. v. Bank of America, N.A.*,
   778 F.Supp.2d 375 (S.D.N.Y. 2011) .....................................................................................8

*Dabney v. Chase National Bank,*
   196 F.2d 668 (2d Cir. 1952) ............................................................................................. 2-3

*Elliott Associates v. J. Henry Schroder Bank & Trust Co.*,
   838 F.2d 66 (2d Cir. 1988) ................................................................................................2, 3

*Greenwich Financial Services Distressed Mortgage Fund 3 LLC v. Countrywide
   Financial Corporation*, 603 F.3d 23 (2d Cir. 2010) ..........................................................3, 5

*Howe v. Bank of New York Mellon*,
   No. 09-Civ-10470, 2011 WL 781940 (S.D.N.Y. Mar. 4, 2011) ..........................................2

*LNC Investments, Inc. v. First Fidelity Bank, National Association,*
   935 F. Supp. 1333 (S.D.N.Y. 1996) .................................................................................2, 8

*Philip v. L.F. Rothschild & Co.*,
   No. 90-civ-0708, 1999 WL 771354 (S.D.N.Y. Sept. 29, 1999) ..........................................2

### STATUTES

28 U.S.C. § 1332 ............................................................................................................................2, 7

As the trustee of the 530 Countrywide trusts that are the subject of the proposed settlement, BNYM is subject to two sets of non-waivable duties that arise solely under New York common law.[1] First, every trustee – including an indenture trustee – has an absolute obligation at all times to avoid conflicts of interest. That obligation was imposed by New York law from the moment that BNYM assumed the trusteeship of each trust. (*See* Point I.A.) And that non-waivable duty under New York law is the basis of several of the claims that BNYM is asserting in this proceeding. (*See* Point I.B.) Second, because BNYM was on notice long before it entered into the proposed settlement that Countrywide had defaulted on its servicing obligations, BNYM also was bound by non-waivable fiduciary obligations under New York law. (*See* Point II.)

Both of these non-waivable duties lie at the heart of the Article 77 proceeding that BNYM filed in the New York State Supreme Court. BNYM is asking the Court to approve its proposed settlement with Bank of America and Countrywide and also to find that BNYM complied with its obligations under all applicable laws – including New York State common law. Moreover, BNYM is seeking an order that forever releases any claims by trust beneficiaries against BNYM for breaching its duties – including the duty under New York common law to avoid conflicts of interest – by entering into the settlement agreement. Thus, because BNYM itself has affirmatively pleaded claims that arise solely out of New York law, this cannot be an action that is "solely" created by or pursuant to a security, and the securities exception in 28 U.S.C. § 1332(d)(9)(C) cannot apply.

---

[1] At the oral argument held on September 21, 2011, the Court ordered the parties to submit memoranda regarding BNYM's non-waivable duties under New York law. Walnut Place submits this supplemental memorandum pursuant to that order.

# ARGUMENT

I. **THIS ACTION INVOLVES CLAIMS THAT RELATE TO BNYM'S NON-WAIVABLE DUTY UNDER NEW YORK LAW TO AVOID CONFLICTS OF INTEREST.**

   A. **Every Trustee Has A Duty Under New York Common Law To Avoid Conflicts Of Interest.**

It has always been the law in New York that every trustee – including an indenture trustee – has an absolute duty to avoid conflicts of interest. This non-waivable duty to avoid conflicts of interest has been recognized by dozens of courts, including this Court, to apply regardless of the terms of the indenture that otherwise defines the duties of the trustee. *Elliott Associates v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 71 (2d Cir. 1988) (holding the only "additional, implicit pre-default" duty of indenture trustee was "to avoid conflicts of interest"); *Howe v. Bank of New York Mellon*, No. 09-Civ-10470(HB), 2011 WL 781940, at *12 (S.D.N.Y. Mar. 4, 2011) ("Courts have imposed an *extra-contractual obligation* pre-default, which requires that an indenture trustee must avoid conflicts of interest and discharge its obligations with absolute singleness of purpose." (emphasis added and internal quotation marks omitted) (quoting *LNC Investments, Inc. v. First Fidelity Bank, National Association*, 935 F. Supp. 1333, 1346 (S.D.N.Y. 1996))); *Philip v. L.F. Rothschild & Co.*, No. 90-civ-0708, 1999 WL 771354, at *2 (S.D.N.Y. Sept. 29, 1999) (same) (Pauley, J.); *AMBAC Indemnity Corp. v. Bankers Trust Co.*, 151 Misc. 2d 334, 340 (N.Y. Sup. Ct. 1991) (noting that, "prior to default," trustee has a fiduciary duty not to advance its own interests at the expense of the certificateholders). Walnut Place has not been able to find a single decision that has denied either the existence of this duty or the fact that it is a non-waivable obligation imposed by New York common law. Indeed, Judge Learned Hand described nearly 60 years ago the absolute obligation of every trustee under New York law to discharge its duties "with absolute singleness of purpose," free of conflicts of interest. Judge Hand rejected the idea that indenture trustees owe no duties to beneficiaries beyond the terms of the written indenture agreement.

> The courts of New York had [not] given any countenance to the notion that, so far as a corporation sees fit to assume the duties of an indenture trustee, it can shake

> off the loyalty demanded of every trustee, corporate or individual. We can find no warrant for so supposing; and indeed, a trust for the benefit of a numerous and changing body of bondholders appears to us to be preeminently an occasion for a scruple even greater than ordinary; for such beneficiaries often have too small a stake to follow the fate of their investment and protect their rights.

*Dabney v. Chase National Bank,* 196 F.2d 668 (2d Cir. 1952). The Second Circuit noted in *Elliott Associates* that "*Dabney* stands for the proposition that a trustee must refrain from engaging in conflicts of interest." 838 F.2d at 71.

Moreover, this obligation to refrain from conflicts of interest arises solely under New York law. The PSAs provide that the "Trustee, prior to the occurrence of an Event of Default and after the curing of all Events of Default that may have occurred, shall undertake to perform such duties and only such duties as are specifically set forth in this Agreement." (PSA § 8.01.[2]) There is no language in the PSAs that expressly prohibits the trustee from engaging in conflicts of interest. Thus, the obligation to refrain from such conflicts cannot be based on the PSA.

### B. The Securities Exception Does Not Apply Because This Action Involves Essential Claims That Arise Solely Under New York Law.

BNYM argues that this action falls under the securities exception to CAFA because it "solely involves a claim . . . that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security." 28 U.S.C. § 1332(d)(9)(C). In particular, BNYM argues that its claims are based on the PSAs, and the PSAs are instruments that create or define securities. That argument fails first because it is based on a fundamental misinterpretation of the decision of the Second Circuit in *Greenwich Financial Services Distressed Mortgage Fund 3 LLC v. Countrywide Financial Corporation*, 603 F.3d 23 (2d Cir. 2010). BNYM is not suing under the PSA as an instrument that creates and defines its securities. BNYM does not even own any securities that were created or defined by the PSA. Instead, BNYM is suing on a contract that happens also to have served the purpose of creating securities that were sold to investors.

---

[2] Citations to the PSA are to the representative PSA for the CWALT 2006-OA19 securitization that was attached as Exhibit A to the Declaration of Matthew D. Ingber in Support of BNYM's Motion to Remand, dated August 31, 2011 [Docket No. 56].

But even if an action based solely on a PSA were always subject to the securities exception, still the exception would not apply in this action. Although *certain* of BNYM's claims may be based on the PSAs, several claims that are essential to this action also arise under the duty imposed by New York common law to avoid conflicts of interest. Moreover, the duty to avoid conflicts is particularly central in this action because the conflicts of interest that Walnut Place and other intervenors and objectors have alleged are tangible conflicts that had a direct effect on the proposed settlement. Thus, it cannot be the case that this action "solely involves" a claim that is created by or pursuant to a security, and the securities exception does not apply.

### 1. The Question Whether BNYM Violated Its Duty To Refrain From Engaging In Conflicts of Interest Is An Essential Claim In This Action.

BNYM appears to have abandoned its original argument that it seeks only one "indivisible" form of relief in this action. The proposed final order and judgment that BNYM is asking this Court to enter includes several claims for relief that specifically ask for a judgment that BNYM acted properly based on "applicable law," including the non-waivable duty under New York common law for trustees to refrain from conflicts of interest.

First, BNYM is asking the Court to adjudicate its claim that "the Trustee has the authority, pursuant to the Governing Agreements *and applicable law* . . . to enter into the Settlement Agreement on behalf of all Trust Beneficiaries." (Proposed Final Order 4 (emphasis added).) BNYM itself specifically refers in its Proposal Final Order not only to the PSAs but also to "applicable law" – which, of course, includes BNYM's duties under New York common law. BNYM is thus affirmatively asking the Court to decide whether, under the New York law that prohibits conflicts of interest, BNYM had the authority to enter into the proposed settlement.

Second, BNYM is asking the Court to adjudicate its claim that "pursuant to the Governing Agreements *and applicable law*, the decision whether to enter into the Settlement Agreement on behalf of all Trust Beneficiaries . . . is a matter within the Trustee's discretion." (Proposed Final Order 4.) Here, too, BNYM is affirmatively asking the Court to decide whether

it has abused its discretion by violating New York law and engaging in a prohibited conflict of interest.

Third, BNYM requests an order that "all Trust Beneficiaries . . . are hereby permanently barred and enjoined from instituting, commencing, or prosecuting . . . any suit, proceeding, or other action asserting against the Trustee any claims arising from or in connection with the Trustee's entry into the Settlement." (Proposed Final Order 9.) That is essentially a claim for a declaratory judgment that BNYM has not violated the New York law against engaging in conflicts of interest and is thus entitled to the release that it is requesting.

All of these provisions of the Proposed Final Order and Judgment demonstrate that this action involves essential claims by BNYM for declarations that it complied with New York law. Importantly, these are all affirmative claims that BNYM itself put before the Court, and that appear on the face of the Proposal Final Order and Judgment and BNYM's petition, which incorporates the Proposed Final Order by reference. These are not the kinds of "defenses" or "collateral legal issues" that the Second Circuit was referring to in *Greenwich* when it held that "almost any securities claim under state law will necessarily 'involve' defenses—such as statutes of limitations—and collateral issues—such as state contract law." 603 F.3d at 31. *Greenwich* "present[ed] only a single claim grounded in the terms of a document that creates a defines a security." *Id.* This action presents many claims, several of which are grounded solely in New York common law. These claims belie BNYM's argument that this action "solely involves" a claim that is created by or pursuant to a security.

### 2. Walnut Place And Other Defendants Have Alleged Tangible Conflicts Of Interest That Further Underscore The Importance Of BNYM's Claims Under New York Law.

There are at least three tangible conflicts of interest that the proposed settlement has thrown into relief. First, under the Pooling and Servicing Agreements, BNYM is indemnified by the Master Servicer of each trust, Countrywide Home Loans Servicing, LP (another predecessor-in-interest of Bank of America Corporation), for costs and liabilities that arise out of certain duties that BNYM is to perform for the trusts. As part of the proposed settlement, BNYM

negotiated for itself an indemnity from Countrywide that goes well beyond the scope of the indemnity that BNYM is otherwise entitled to under the PSAs. In particular, Countrywide agreed to indemnify BNYM for all costs and liabilities that BNYM may incur as a result of its participation in the very unusual process of negotiating the proposed settlement. This expanded indemnity is embodied in a "side letter" to the Settlement Agreement. It is very unusual, to say the least, for a trustee that says it is representing the interests of the beneficiaries of a trust, to demand and obtain an indemnity from the very party that is adverse to that trust and its beneficiaries (in this case, the certificateholders). BNYM concedes in its petition that it was concerned about its liability for the way in which it was handling (or, more accurately, ignoring) the demands of its beneficiaries that it take legal action for their benefit against Countrywide and Bank of America. For example, BNYM referred to "reports that a group of Certificateholders has considered taking action against BNY Mellon for its participation in the Settlement process." (BNYM Petition ¶ 13.) BNYM also states that "the Trustee also may be subject to claims by individual Certificateholders who believe that the Settlement, though benefiting thousands of Trust Beneficiaries now and in the future, may not be in their individual best interests." (BNYM Petition ¶ 15.) The proposed settlement protects BNYM from these liabilities by means of an indemnity from the party against which it was supposed to protect the interests of its beneficiaries and now anticipates that it may be liable for its failure to do so.

Second, under the PSAs, BNYM is indemnified solely by Countrywide Home Loans Servicing, yet the parent of that entity, Bank of America Corporation, guaranteed that indemnity to BNYM. The guarantee does nothing for the trusts or the certificateholders, but it provides a great benefit to BNYM. Indeed, BNYM states expressly in its petition that it doubts the solvency of Countrywide, so much so that it argues that Countrywide's supposed inability to pay a large judgment is a reason to accept the proposed settlement. (BNYM Petition ¶¶ 78-81.) Thus, the guarantee from Bank of America puts BNYM in a substantially better position than it was in before negotiating the proposed settlement, at the direct expense of the certificateholders whose interests BNYM purports to protect.

Third, BNYM cannot objectively evaluate the fairness of the proposed settlement because BNYM has duties to – and (as BNYM itself acknowledges) is potentially liable to – the certificateholders of all 530 trusts. It is obviously in BNYM's own interest to "settle" the claims of all 530 trusts at the same time on substantially identical terms. Otherwise, BNYM could be liable to certificateholders that believe they were treated less favorably than others. But not all of the trusts are identically situated. For example, Walnut Place is the only certificateholder in any Countrywide trust that has yet invested the time and money to conduct an independent investigation and actually sue Countrywide and Bank of America for breaches of representations and warranties. If BNYM were not conflicted, it would have insisted that the proposed settlement take into account the far greater recovery that all certificateholders in the OA10, OA3, and OA21 trusts (that is, the three trusts that are the subject of active litigation) can expect because of Walnut Place's diligence in uncovering pervasive breaches of representations and warranties in those trusts.

These conflicts lie at the heart of the claims that BNYM is making in this proceeding, and there is no doubt that the duty to avoid these conflicts arises exclusively from New York law. This action thus "involves" claims under New York common law that are at least as essential as any claims that may arise out of the PSAs. Because this action does not "solely" involve claims that were created by or pursuant to a security, section 1332(d)(9)(C) does not apply, and this Court has jurisdiction over this action as a mass action under CAFA.

## II.   THIS ACTION INVOLVES CLAIMS THAT RELATE TO BNYM'S POST-DEFAULT NON-WAIVABLE FIDUCIARY DUTY UNDER NEW YORK LAW.

New York law also imposes a second non-waivable duty on an indenture trustee, that is, a fiduciary duty that arises once an event of default occurs under the PSA. Because BNYM was subject to those fiduciary duties when it negotiated and signed the proposed settlement, this action necessarily involves BNYM's claim for a judgment that it complied with those duties, so that BNYM may be released from any liability for breach of those duties.

BNYM's post-default fiduciary duty is alluded to in Section 8.01 of the PSA. PSA § 8.01 ("In case an Event of Default has occurred . . . the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise under the circumstances in the conduct of such person's own affairs."). But the source of this fiduciary duty is NewYork common law. After a default has occurred "it is clear that the indenture trustee's obligations come more closely to resemble those of an ordinary fiduciary, *regardless of any limitations or exculpatory provisions contained in the indenture.*" *Beck v. Manufacturers Hanover Trust Co.*, 218 A.D.2d 1, 12 (N.Y. App. Div. 1995) (emphasis added); *see also LNC Investments, Inc.*, 935 F. Supp. at 1348 (noting that duty of indenture trustee post default "although defined by reference to the indenture, is imposed by operation of New York common law"); *BNP Paribas Mortgage Corp. v. Bank of America, N.A.*, 778 F. Supp. 2d 375 (S.D.N.Y. 2011) ("After an event of default the indenture trustee's fiduciary duties *expand by operation of New York common law*, such that fidelity to the terms of an indenture does not immunize an indenture trustee against claims that the trustee has acted in a manner inconsistent with his or her fiduciary duty . . . ." (emphasis added)).

Publicly available information establishes that an Event of Default had occurred in many of the 530 trusts long before BNYM entered into the proposed settlement. Under Section 7.01(ii) of the PSA, an "Event of Default" occurs when five requirements have been satisfied. Those requirements are:

> [1] [A]ny failure by the Master Servicer to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in this Agreement . . . , [2] which failure materially affects the rights of the Certificateholders, [3] that failure continues unremedied for a period of 60 days after the date on which [4] written notice of such failure shall have been given . . . to the Master Servicer and the Trustee by [5] the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates . . . .

PSA § 7.01(ii). Each of the five requirements for an Event of Default was satisfied before the Settlement Agreement was signed. On October 18, 2010, BlackRock, PIMCO, and several other large investors sent a letter to BNYM and Countrywide Home Loans Servicing LP, the Master

Servicer for the Trusts, which was styled as a "Notice to Trustee and Master Servicer of Failure of Master Servicer to Perform." (Exhibit A to the Declaration of Owen L. Cyrulnik, dated September 27, 2011, at 1.) The letter stated that (1) the Master Servicer had failed to perform its duties under four separate sections of the PSAs for 115 of the Trusts and that (2) the failures "materially affected the rights of Certificateholders." (*Id*.) Those failures are the same failures that BNYM proposes to settle under the Settlement Agreement. They have (3) "continue[d] unremedied" for eleven months after the notice was sent. (*Id*.) The investors who sent (4) the letter were (5) "Holders of not less than 25% of the Voting Rights in Certificates" of 115 trusts, 106 of which are covered by the Settlement Agreement. (*Id*.) Thus, under the terms of the PSAs, an Event of Default occurred on 115 of the Trusts on December 17, 2010, that is, 60 days after the letter of October 18. Because an Event of Default occurred on these Trusts, BNYM owed full fiduciary duties under New York law to the certificateholders of those trusts.

     BNYM may argue that no Event of Default has occurred for two reasons. First, it may argue that the letter of October 18 was not formally styled as a notice of an Event of Default, and so there was no Event of Default. That is absurd. The PSAs do not provide that an Event of Default may be triggered only by sending a document entitled "Notice of Default." The PSAs require only that 25% of certificateholders give notice that the Master Servicer failed to perform under the contract. The October 18 letter did precisely that and was therefore sufficient to establish an Event of Default.

     Second, BNYM may argue that no Event of Default occurred because on December 15, 2010, BNYM, Bank of America, and the self-appointed investors "agreed to extend any time periods commenced by the October 18 letter." Press Release, Bank of America Issues Statement (Dec. 15, 2010) (Cyrulnik Decl. Ex. B.) But that is irrelevant for two reasons. The fiduciary duties that BNYM owes to the trust beneficiaries are created by New York law. BNYM cannot agree with Bank of America and a self-appointed minority of trust beneficiaries to waive its fiduciary duty for *any* period of time. Moreover, even if BNYM and the trust beneficiaries could agree to waive those duties, they would have to do so by amending the PSA. Absent such

amendment, BNYM assumes a fiduciary duty from the moment it receives notice of a default until the moment the default is cured. Because BNYM, Bank of America, and the trust beneficiaries did not follow the amendment procedures in Section 10.01 of the PSA, any purported amendment would be invalid.

## CONCLUSION

This action is a mass action under CAFA. For all of the reasons argued above and in Walnut Place's opposition to BNYM's motion to remand, this action does not solely involve claims created by or pursuant to a security, and the securities exception to federal jurisdiction under CAFA therefore does not apply. Walnut Place respectfully requests that BNYM's motion to remand should be denied.

Dated: New York, New York
September 27, 2011

GRAIS & ELLSWORTH LLP

By: _____
Owen L. Cyrulnik (OC 0598)

David J. Grais (DG 7118)
Kathryn E. Matthews (KN 0932)
Leanne M. Wilson (LW 1225)

40 East 52nd Street
New York, New York 10022
(212) 755-0100
(212) 755-0052 (fax)

Attorneys for Walnut Place LLC, Walnut Place II LLC, Walnut Place III LLC, Walnut Place IV LLC, Walnut Place V LLC, Walnut Place VI LLC, Walnut Place VII LLC, Walnut Place VIII LLC, Walnut Place IX LLC, Walnut Place X LLC, and Walnut Place XI LLC