UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
In the matter of the application of                 :

THE BANK OF NEW YORK MELLON          :
(as trustee under various pooling and
servicing agreements and indenture trustee   :
under various indentures), *et al.*,

                                                    :

                    Petitioners,                    :

                                                    :
          -against-
                                                    :

WALNUT PLACE LLC, *et al.*,                         :

          Intervenor-Respondents.                   :

                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/19/11

11 Civ. 5988 (WHP)

MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

          The Bank of New York Mellon, as trustee for hundreds of trusts, seeks to dispose

of billions of dollars in toxic mortgage claims through an arcane summary procedure in state

court. The question presented is whether this mass settlement, which implicates core national

interests in the integrity of the financial markets, is immune from review in federal court.

          On June 29, 2011, The Bank of New York Mellon ("BNYM"), filed a Verified

Petition (the "Petition") commencing a proceeding under Article 77 of the New York Civil

Practice Law and Rules in New York Supreme Court (New York County) before the Honorable

Barbara R. Kapnick. See In the matter of the application of the Bank of New York Mellon *et al.*

(Index No. 651786/2011) (the "Article 77 Proceeding"). The Walnut Place entities (collectively,

"Walnut Place"), intervenor-respondents in the Article 77 Proceeding, removed this action to

federal court. BNYM now moves to remand. For the following reasons, BNYM's motion is

denied.

1

To raise money, Countrywide Home Loans, Inc. and various affiliates (collectively, "Countrywide") entered into a number of securitization transactions between 2004 and 2008. (Declaration of Owen L. Cyrulnik dated Sept. 14, 2011 ("Cyrulnik Decl.") Ex. A, Petition ("Pet.") ¶¶ 2, 9.) In these transactions, Countrywide conveyed portfolios of securitized residential mortgages through a third party to BNYM, as trustee, to hold in trust. (Pet. ¶ 2.) In turn, investors purchased certificates or notes evidencing various categories of ownership interests in the trusts. (Pet. ¶ 2.) BNYM acts as trustee for hundreds of these mortgage securitization trusts created by Pooling and Servicing Agreements or Sale and Servicing Agreements (collectively, "PSAs"). (Pet. at 1.) Bank of America Corporation ("Bank of America") now owns Countrywide. (Pet. ¶ 9.)

The Walnut Place entities are Delaware limited liability companies whose members are limited partnerships organized under Delaware law. (Cyrulnik Decl. Ex. B, Notice of Removal dated Aug. 26, 2011 ("Removal Notice") ¶ 12.) Walnut Place avers that, based on the citizenship of their partners, both Walnut Place VIII LLC and Walnut Place X LLC are citizens of Connecticut, Maryland, Massachusetts, and New Hampshire. (Removal Notice ¶ 12.) Another entity, Walnut Place IX LLC, is a citizen of Connecticut, Maryland, Massachusetts, New Hampshire, and New Jersey. (Removal Notice ¶ 12.) Walnut Place owns securities issued by three Countrywide trusts. (Removal Notice ¶ 5.)

The circumstances leading to the present litigation began in June 2010, when at least one institutional investor holding mortgage-backed certificates issued by the trusts sent a letter to BNYM. (Pet. ¶ 27.) In that letter, the investor(s) asserted that Countrywide had sold a large number of mortgages into the trusts that failed to comply with certain representations and

2

warranties contained in the PSAs. (Pet. ¶ 27.) They (or it) cited the alleged excessive early

default and foreclosure rates for the mortgages, Countrywide's settlements with various state

Attorneys General, and publicly disclosed e-mails from Countrywide officials as evidence of

breaches of the representations and warranties. (Pet. ¶ 27.) As a remedy, the investor(s)

contended that Countrywide and Bank of America were obligated to repurchase the defaulting

mortgage loans. (Pet. ¶ 27.)

BNYM veils the identity of the pioneering investor(s). And the June 2010 letter

—which is the first investor communication with BNYM mentioned in the Petition— is not part

of the record before this Court or Justice Kapnick. But one thing is certain: no more than eight

institutional investors had banded together by October 18, 2010, when they asserted a notice of

nonperformance in a letter that is part of the record before Justice Kapnick. (Affirmation of

Owen L. Cyrulnik in Further Support of Petition to Intervene dated July 13, 2011, Ex. 2)

(NYSCEF Doc. No. 50-2). BNYM attributes actions to a large group of investors under the

banner "the Institutional Investors." BNYM's Petition is silent, however, regarding when and

how these investors assembled themselves.[1]

In November 2010, fearing that the trusts' claims against Countrywide and Bank

of America would lapse as a result of BNYM's torpor, several institutional investors—acting

without Walnut Place—commenced settlement discussions with Countrywide and Bank of

America. (Pet. ¶35; Transcript of Proceedings held on Sept. 21, 2011 ("Sept. 21 Hr'g Tr.") at

62.) Although BNYM was a party to the negotiations, these investors initiated the settlement

---

[1] The roster of "Institutional Investors" has swollen to more than twenty and includes BlackRock
Financial Management Inc., Goldman Sachs Asset Management, L.P., PIMCO Investment
Management Company LLC, and several "Maiden Lane" entities controlled by the Federal
Reserve Bank of New York.

process because "the trustee wasn't doing anything." (Sept. 21 Hr'g Tr. at 62.) In their negotiations, the investors considered material non-public information from Bank of America that was unavailable to other certificate-holders, including Walnut Place. (Ingber Decl. Ex. C, Transcript of a Conference before the Hon. Barbara R. Kapnick dated Aug. 5, 2011 ("Aug. 5 Hr'g Tr.") at 24-25.) And no certificate-holders other than this clique of institutional investors participated in these discussions. (Petition to Intervene ¶ 7.)

Independently, Walnut Place sued Countrywide on February 23, 2011, for breach of the representations and warranties contained in the PSAs. (Declaration of Matthew D. Ingber dated Aug. 31, 2011 ("Ingber Decl.") Ex. F, Verified Petition to Intervene in the Article 77 Proceeding, filed on July 5, 2011 ("Petition to Intervene") ¶ 4.) Two other investor lawsuits were subsequently filed against BNYM, Countrywide, and Bank of America. (Pet. ¶ 14.)

On June 28, 2011, BNYM entered into an agreement with Countrywide and Bank of America to settle all potential claims belonging to 530 of the trusts for which BNYM serves as trustee (the "Settlement Agreement"). (Pet. ¶¶ 10-11.) Although the trusts' claims may exceed $150 billion, (Removal Notice ¶ 13), the Settlement Agreement requires a payment of $8.5 billion to trust beneficiaries and mandates certain improvements to Countrywide's mortgage servicing process. (Pet. ¶ 11.) The Settlement Agreement does not encompass sixty-three other trusts for which BNYM is trustee with a combined unpaid balance of approximately $15.3 billion as of September 26, 2011. (Letter from Matthew Ingber to the Court dated Sept. 27, 2011) (ECF No. 108).

On June 29, 2011, BNYM initiated the Article 77 Proceeding without notifying any of the trust beneficiaries. (Transcript of Proceedings held on Sept. 1, 2011 ("Sept. 1 Hr'g Tr.") at 20.) While BNYM knew that several trust beneficiaries had already begun litigation,

BNYM proceeded ex parte and did not name a single respondent or defendant. (Removal Notice ¶ 3.) BNYM sought an order (i) declaring that BNYM had behaved reasonably by entering into the Settlement Agreement, (ii) ordering BNYM, Countrywide, and Bank of America to consummate the Settlement Agreement, and (iii) releasing claims brought by investors, including claims being litigated by Walnut Place. (Cyrulnik Decl. Ex. C., Proposed Final Order and Judgment, filed on June 29, 2011 ("Proposed Final Order and Judgment") at 4-7.)

Like all New York special proceedings, Article 77 proceedings are intended to be expedited. See Vincent C. Alexander, Practice Commentaries C401:1 (2010). At the outset of the Article 77 Proceeding, Justice Kapnick approved a scheduling order setting an August 30, 2011 deadline for any person to object to the Settlement Agreement and a November 17, 2011 final hearing date. (Declaration of Exigency dated Aug. 31, 2011 ¶ 3.) Walnut Place filed a petition to intervene on July 5, which Justice Kapnick granted on August 19. (Removal Notice ¶¶ 5-6.)

At an August 5 hearing, Justice Kapnick explained that there would be no opt-outs to the Settlement Agreement because an Article 77 proceeding is not a class action. (Aug. 5 Hr'g Tr. at 18.) Justice Kapnick also explained that Article 77 proceedings are, to say the least, exotic. (Aug. 5 Hr'g Tr. at 18) ("It's important to remember that this petition was brought as an Article 77 petition, which I personally have hardly ever seen before, so I had to go into the C.P.L.R., which doesn't have too much about Article 77, and read it."). In sharp contrast to the $8.5 billion Settlement Agreement at issue here, proceedings under Article 77 typically "present mere matters of administration." 22 Carmody-Wait New York Practice § 131:1 (2d ed. 2011). Indeed, this Court has located only twenty-eight decisions—many of which were short form orders—published in the past forty years concerning Article 77. Without exception, the often-

5

uncontested proceedings described in these decisions and orders were garden-variety matters of trust administration.[2]  Most of the decisions this Court has located concerning Article 77 and its predecessor, Article 79, date from the 1950s and early 1960s.  It is no wonder Justice Kapnick had "hardly ever seen [one] before."  (Aug. 5 Hr'g Tr. at 18.)

On August 26, 2011, Walnut Place removed the Article 77 Proceeding to this Court under the "mass action" provisions of the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d), 1453, and 1711-1715 ("CAFA").  (Removal Notice ¶ 11.)

## DISCUSSION

I.     Removal Under CAFA

A.  Timeliness and Waiver

This Court first addresses BNYM's fleeting contention that Walnut Place did not timely file its notice of removal.  To begin with, BNYM makes no attempt to rebut Walnut Place's arguments supporting the timeliness of its removal.  Nor could it.  Before Justice Kapnick granted Walnut Place's motion to intervene in the Article 77 Proceeding, there were no adverse parties in that action capable of removing it to federal court.  Indeed, the removal statute provides that an action that is not initially removable may be removed within 30 days of the case becoming removable.  See 28 U.S.C. § 1446(b).  "Courts confronting the special issue of the timeliness of removal by an *intervenor* rather than a defendant have held that the thirty day

---

[2] A majority of the Article 77 decisions published in the past quarter century concerned simple family trust disputes.  See, e.g. Matter of Barash v. N. Trust Corp., 862 N.Y.S.2d 293 (2d Dep't 2008); McHugh v. Weissman, 847 N.Y.S.2d 566 (1st Dep't 2007); Gouiran v. Gouiran, 693 N.Y.S.2d 127 (1st Dep't 1999); Milea v. Hugunin, 890 N.Y.S.2d 369 (Table) (Sup. Ct. Onondaga Cnty. 2009); Chiarella v. Chiarella, 842 N.Y.S.2d 253 (N.Y. Sup. Ct. Queens Cnty. 2007); Bullock v. Clarke, Index No. K1-2001-001568, 2002 WL 31119931 (N.Y. Sup. Ct. Chautauqua Cnty. Sept. 10, 2002).

statutory period begins to run either on the date an intervention petition is filed in the state court from which removal is sought or on the date the state court grants the motion to intervene." Gen. Ins. Co. of Am. v. Tilcon N.Y., Inc., No. 96 Civ. 1258 (JFK), 1996 WL 389265, at *1 (S.D.N.Y. July 11, 1996) (emphasis in original); see also Johnson Serv. Co. v. H.S. Kaiser Co., 324 F. Supp. 745, 747, 750 (N.D. Ill. 1971) (holding that the government could remove the case only after the Court had granted its motion to intervene). Here, Walnut Place filed a timely notice of removal less than 30 days after Justice Kapnick granted its petition to intervene. (Removal Notice ¶¶ 5-6.)

BNYM relies on Irving Trust Co. v. Century Export & Import, S.A., 464 F. Supp. 1232, 1239 (S.D.N.Y. 1979), and Capoccia v. Boone, No. 1:07 Civ. 12, 2007 WL 1655348, at *4 (D. Vt. June 5, 2007), for the proposition that the thirty-day removal period began to run when Walnut Place moved to intervene. But the intervenor in Irving Trust sought to remove the case to federal court well after the defendants in that action declined to do so. See 464 F. Supp. at 1235-36. And while the Court in Capoccia permitted the United States to remove the case before its petition to intervene was granted, that action was also independently removable before the United States intervened. See 2007 WL 1655348, at *4. Here, by contrast, there were no adverse parties in the Article 77 Proceeding capable of removal until Justice Kapnick granted Walnut Place's Petition to Intervene.

Nor did Walnut Place waive its right to remove. Defendants (and intervenors) waive their right to remove only if they demonstrate a "clear and unequivocal" intent to litigate in state court. Dri Mark Products, Inc. v. Meyercord Co., 194 F. Supp. 536, 537 (S.D.N.Y. 1961); see also JP Morgan Chase Bank, NA v. Reijtenbagh, 611 F. Supp. 2d 289, 389 (S.D.N.Y. 2009) ("Any waiver of the right of removal must be clear and unequivocal.") (internal

punctuation omitted). Further, defendants do not waive their right to remove "where their action in state court is merely defensive, such as responding to an ex parte order to show cause." Hill v. Citicorp, 804 F. Supp. 514, 517 (S.D.N.Y. 1992). Here, Walnut Place simply took defensive actions to preserve its rights, including seeking discovery and modifications to the state court's preliminary schedule and order. (Ingber Decl. Ex. G.) Accordingly, Walnut Place has not waived its right to remove.

### B. The Mass Action Provision

As the party opposing remand, Walnut Place "bears the burden of showing that federal jurisdiction is proper." Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp., 603 F.3d 23, 26 (2d Cir. 2010). To carry its burden, Walnut Place argues that this action may be removed as a "mass action" under CAFA. CAFA defines a "mass action" as a civil action in which (1) "monetary relief claims" (2) "of 100 or more persons" (3) "are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact." 18 U.S.C. § 1332(d)(11)(B)(i). The Article 77 Proceeding satisfies each of these requirements for removal.[3]

To support its arguments for remand, BNYM relies heavily on CAFA's legislative history. But this Court is reluctant to indulge the "naive belief" that "what is said by a single person in a floor debate or by a committee report represents the view of Congress as a whole. . . ." Zedner v. United States, 547 U.S. 489, 510 (2006) (Scalia, J., concurring in part and

---

[3] The Article 77 Proceeding is a "civil action" subject to removal. See, e.g., Casale v. Metro. Transit Auth., No. 05 Civ. 4232 (MBM), 2005 WL 3466405, at *5-7 & n.3 (S.D.N.Y. Dec. 19, 2005) (special proceeding under Article 78 of the CPLR is removable); Heifetz v. Tugendrajch, 542 F. Supp. 1207, 1208 (E.D.N.Y. 1982) (special proceeding under Article 75 of the CPLR is removable).

concurring in the judgment). In any event, the legislative history of CAFA cuts both ways. See, e.g., 151 Cong. Rec. H723, H727 (2005) (statement of Rep. Sensenbrenner) ("If a purported class action is removed under these jurisdictional provisions, the named plaintiff(s) should bear the burden of demonstrating that removal was improper.").

    1. Monetary Relief Claims

Because BNYM seeks a court order directing Bank of America and Countrywide to pay $8.5 billion to the trustee and the trusts, Walnut Place argues that BNYM plainly seeks "monetary relief." In contrast, BNYM argues that it seeks only equitable relief, as opposed to "monetary relief," in the Article 77 Proceeding. According to BNYM, it seeks only a judicial declaration that it acted reasonably and in good faith as trustee as well as a court order enjoining BNYM and Bank of America to consummate the Settlement Agreement.

BNYM proposes a false dichotomy between equitable relief and monetary relief. It is true enough that the administration of trusts is generally equitable. See e.g., In re Salkin, 170 N.Y.S.2d 191, 194 (N.Y. Sup. Ct. N.Y. Cnty. 1957, aff'd, 178 N.Y.S.2d 613 (1st Dep't 1958) (explaining that the "inherent nature" of a proceeding in which a trustee seeks judicial review of his actions "is in equity"). And it is also true that cases seeking only non-monetary relief, such as injunctions, cannot be removed under CAFA. See Lowery v. Ala. Power Co., 483 F.3d 1184, 1202 n.45 (11th Cir. 2007). But the distinction between equitable relief and monetary relief is not as stark as BNYM imagines. It is well established that courts sitting in equity may award monetary relief, if not money damages. See Bowen v. Massachusetts, 487 U.S. 879, 893 (1988) (explaining that not all forms of monetary relief are "money damages"); see also F.T.C. v. Bronson Partners, LLC, ---F.3d----, 2011 WL 3629718, at *3 (2d Cir. Aug. 19, 2011) (holding that the Federal Trade Commission Act "permits courts to grant ancillary equitable relief,

9

including equitable monetary relief"); cf. also DiTolla v. Doral Dental IPA of N.Y., LLC, 469 F.3d 271, 275-76 (2d Cir. 2006) (recognizing that a purely equitable claim for an accounting often includes demands for monetary relief).

BNYM's argument exalts form over substance. Were BNYM to prevail in the Article 77 Proceeding, Countrywide and Bank of America would transfer $8.5 billion to the trusts. (Pet. ¶ 11.) If the court-ordered transfer of $8.5 billion does not constitute "monetary relief," it is difficult to imagine what does. For this reason, the Article 77 Proceeding involves "monetary relief claims."

    2. Claims of 100 or More Persons

Walnut Place contends that the Article 77 Proceeding satisfies CAFA's numerosity requirement because BNYM acts as trustee for 530 separate trusts. BNYM responds that the Article 77 Proceeding does not involve the claims of 100 or more persons because it involves only "one petitioner making one request for a settlement." BNYM's argument is untenable. In its Petition, BNYM purports to act "solely in its capacity as trustee of the five hundred and thirty . . . residential mortgage-securitization trusts." (Pet. at 1.) As this language indicates, BNYM is trustee for 530 separate and unique trusts and seeks approval for its decision to settle the claims of each individual trust. Under New York law, trustees are separate legal entities with respect to each trust that they administer. See Tuper v. Tuper, 824 N.Y.S.2d 857, 34 A.D.3d 1280, 1281 (3d Dep't 2006) ("[P]ersons suing or being sued in their official or representative capacity are . . . distinct persons, and strangers to any right or liability as an individual."); see also In re Steen, 506 N.Y.S. 2d 640, 641 (N.Y. Sur. 1986) ("[T]he coincidence of naming the same bank as trustee of both trusts cannot be construed as a continuance or merger

of the second trust into the first."). Thus, the Article 77 Proceeding involves "claims of more than 100 persons."[4]

### 3. Claims Proposed to be Tried Jointly Because They Involve Common Questions of Law or Fact

Walnut Place argues that claims involving common questions of law or fact will be "tried" in the Article 77 Proceeding because it is an adversary proceeding in which the court will evaluate BNYM's actions as trustee for 530 distinct trusts. BNYM counters formalistically that no claims will be "tried" because the purpose of the Article 77 Proceeding is to approve a settlement in lieu of trial. But this argument misses the mark. A trial is "a formal judicial examination of evidence and determination of claims in an adversary proceeding." Black's Law Dictionary (9th ed. 2009). And the Article 77 Proceeding fits comfortably within that definition. In the Article 77 Proceeding, BNYM seeks a judicial determination that it acted properly in settling with Bank of America. (Proposed Final Order and Judgment at 4-5.) That this determination can be reached only after the examination of evidence and determination of claims in an adversary proceeding amply demonstrates that BNYM seeks to "try" its claims jointly.

And as BNYM acknowledges, the purpose of the Article 77 Proceeding is to determine the acceptability of a global settlement impacting 530 separate legal entities. It is, therefore, manifest that the Article 77 Proceeding concerns "common questions of law or fact."

---

[4] This Court has found no authority suggesting that a single Article 77 proceeding may evaluate the actions of 530 trustees with respect to 530 trusts. Certification of this question to the New York Court of Appeals may be warranted because (i) "the New York Court of Appeals has not squarely addressed" this issue, (ii) it is "of importance to the state," and (iii) it could be claim determinative. Joseph v. Athansopoulos, 648 F.3d 58, 67 (2d Cir. 2011).

4. Walnut Place's Capacity to Remove

The federal removal statute permits removal only by "a defendant or defendants." 28 U.S.C. § 1446(a). Because BNYM seeks no relief against Walnut Place, BNYM argues that Walnut Place is not a "defendant" and therefore may not remove. But it is well settled that intervenors like Walnut Place may remove under certain circumstances.

As BNYM concedes, Walnut Place intervened as an adverse party in the Article 77 Proceeding. Indeed, BNYM has represented that "to the extent that certain Certificateholders or other interested parties may wish to be heard on the subject of the Settlement or the judicial instructions sought through this Petition, those parties may become adverse." (Pet. ¶ 18.) And that is precisely what happened when Walnut Place intervened. Nor does it matter that Walnut Place and the other certificate-holders will receive a payment from Bank of America and Countrywide if the settlement is approved. Because Walnut Place contends that the settlement negotiated by BNYM is both inadequate and rife with conflicts of interest, it has assumed a position adverse to BNYM.

BNYM's reliance on Ackert v. Ausman, 217 F. Supp. 934 (S.D.N.Y. 1963), is misplaced. In Ackert, the court granted plaintiff's motion to remand because it concluded that shareholders who objected to the settlement of a class action were aligned with the plaintiff for removal purposes. See 217 F. Supp. at 936. Here, by contrast, intervenors like Walnut Place are the adverse parties in the Article 77 Proceeding that BNYM instigated. As both parties recognize, the Article 77 Proceeding is not a class action in which BNYM (or the trusts) are plaintiffs and Bank of America and Countrywide are defendants. Rather, because BNYM seeks

12

to settle the trusts' claims without the approval and, arguably, against the interests of beneficiaries like Walnut Place, BNYM and Walnut Place are not aligned as "plaintiffs."

Further, BNYM's crabbed reading of "defendant" overlooks the fact that "intervenors may file notices of removal if they are properly aligned as defendants." 14C Wright, Miller, et al., Federal Practice & Procedure § 3730 (4th ed. 2011); see also Sears Roebuck & Co. v. Glenwal Co., 325 F. Supp. 86, 88-89 (S.D.N.Y. 1970) (In filing a special proceeding to stay arbitration, "it is clear that Sears . . . was the petitioner or plaintiff in the New York proceeding, and that Glenwal, as the respondent or 'defendant,' properly filed its petition for removal."). Thus, respondents in special proceedings, such as the Article 77 Proceeding at issue here, may be deemed "defendants" for removal purposes. See Heifetz, 542 F. Supp. at 1208-09 (special proceedings under Article 75 of the New York CPLR are "civil actions" that may be removed if federal jurisdiction otherwise exists). Because Walnut Place, as an intervenor, is adverse to BNYM in the Article 77 Proceeding, it may properly file for removal.[5]

C.     The CAFA Securities Exception

Because the Article 77 Proceeding satisfies the general "mass action" requirements of CAFA, BNYM has "the burden of demonstrating that remand is warranted on the basis of one of the enumerated exceptions." Greenwich Fin., 603 F.3d at 26. Relying heavily on the Second Circuit's recent decision in Greenwich Financial, BNYM argues that the Article 77 Proceeding cannot be removed because it falls under CAFA's "securities exception."

---

[5] This Court also rejects BNYM's cursory suggestion that CAFA's "home state" exception bars removal. The party invoking that exception has the burden of proving that it applies, and BNYM has not made any attempt to carry its burden. See Romano v. SLS Residential, Inc., No. 07 Civ. 0234 (KTD), 2011 WL 2671526, at *3 (S.D.N.Y. June 22, 2011).

But neither the statutory language of the securities exception nor <u>Greenwich Financial</u> can support the weight BNYM would place on them.

Under the securities exception, CAFA's removal provisions "shall not apply to any class action that solely involves . . . a claim that relates to the rights or duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security (as defined under section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1)) and the regulations issued thereunder)." 28 U.S.C. § 1453(d). Section 1332(d), which creates subject matter jurisdiction over the types of cases that are removable under CAFA, contains in subsection (d)(9)(C) an exception for securities-related claims that is identical to the exception in § 1453(d)(3).

In <u>Greenwich Financial</u>, the Second Circuit held that the securities exception to CAFA barred federal jurisdiction over declaratory judgment claims brought by holders of certificates issued by trusts under various PSAs. In delineating the scope of the securities exception, the Court of Appeals explained that the language of the exception "was intended to differentiate claims based either on the terms of the instruments that create and define securities or the duties imposed on persons who administer securities from claims based on rights arising from independent sources of state law." <u>Greenwich Fin.</u>, 603 F.3d at 28-29 (quoting <u>Estate of Pew v. Cardarelli</u>, 527 F.3d 25, 33 (2d Cir. 2008)) (internal punctuation omitted). Thus, the Court reasoned that "[t]he key distinction between suits that [are] immune from removal under CAFA and those that [are] not is that immune suits [seek] to enforce the rights of the securities 'holders as holders.'" <u>Greenwich Fin.</u>, 603 F.3d at 29. Because the plaintiffs in <u>Greenwich Financial</u> were suing under the terms of an instrument that created a security (i.e., the PSAs), and

14

not under generally applicable state law, the Court held that the securities exception applied and remand was required.

The analysis in Greenwich Financial expanded on the Second Circuit's earlier opinion in Cardarelli. In that case, the Court of Appeals held that the securities exception to CAFA did not bar removal of securities holders' state law fraud claims. See Cardarelli, 527 F.3d at 26. As Greenwich Financial clarified, "[t]he principle we stated in Cardarelli is that the securities exception . . . applies to suits that enforce the terms of instruments that create and define securities, and . . . it does not apply to suits to enforce rights that are superimposed by a state's corporation law or common law." Greenwich Fin., 603 F.3d at 29 (quoting Cardarelli, 527 F.3d at 31) (internal punctuation omitted).

Not surprisingly, the parties disagree regarding the application of the securities exception to this case. BNYM finds dispositive effect in the Second Circuit's statements in Greenwich Financial that the securities exception "examines the source of the right that the suit seeks to enforce" and applies to all "suits that seek to enforce the terms of instruments that create and define securities or the duties imposed on persons who administer securities." Greenwich Fin., 603 F.3d at 28, 30. Because BNYM, as trustee, seeks a ruling that it complied with its obligations under the PSAs, it argues that the Article 77 Proceeding "seek[s] to enforce the terms of instruments that create or define securities." Greenwich Fin., 603 F.3d at 28. On this basis, BNYM argues that the securities exception bars removal.

For its part, Walnut Place maintains that the focus under Greenwich Financial is the status that entitles the plaintiff to sue for the relief that it seeks. Walnut Place argues that if the plaintiff has a right to sue solely because of its status as an owner of a security, then the

securities exception applies. If, however, the plaintiff has a right to sue for some other reason, then the exception does not apply.

Under Cardarelli and Greenwich Financial, the pivotal question in determining whether the securities exception bars removal is whether a plaintiff's claims arise under the terms of an instrument that creates or defines securities or plaintiff's claims arise under an independent source of state or federal law. See Greenwich Fin., 603 F.3d at 30. Walnut Place's focus on the status of the plaintiff is, therefore, misplaced. Rather, a plaintiff's status is important only to the extent that it determines which source of law governs its claims. See Cardarelli, 527 F.3d at 32.

If, as BNYM argues, the only relevant legal standards for evaluating its conduct as trustee are found in the PSAs, then the securities exception would almost certainly apply. Neither party disputes that the PSAs are "instruments that create and define securities." Greenwich Fin., 603 F.3d at 29. If, however, the trustee's conduct in approving the settlement must also be evaluated under some other source of law, such as New York's common law of trusts, then the securities exception does not apply. Because a court evaluating BNYM's conduct as Trustee must rely on New York common law, and not simply the bare text of the PSAs, the securities exception does not apply here.

As BNYM has conceded, New York trustees owe certain common law duties to trust beneficiaries that cannot be waived. These common law duties are consistent with the minimum duties outlined in the Trust Indenture Act, 15 U.S.C. § 77aaa et seq. See LNC Invs., Inc. v. First Fid. Bank, Nat'l Assoc., 935 F.Supp. 1333, 1346 (S.D.N.Y. 1996). Specifically, every trustee —including indenture trustees whose responsibilities are limited by contract — has

an absolute duty to avoid conflicts of interest.[6] This duty to avoid conflicts of interest applies

notwithstanding the terms of the instrument that purports to define the duties of the trustee. See

Elliott Assocs. v. J. Henry Schroder Bank & Trust Co., 838 F.2d 66, 71 (2d Cir. 1988) (holding

that indenture trustees have an "implicit, pre-default [duty] . . . to avoid conflicts of interest").

As Judge Learned Hand explained nearly sixty years ago, New York courts have refused to give

"any countenance to the notion that, so far as a corporation sees fit to assume the duties of an

indenture trustee, it can shake off the loyalty demanded of every trustee, corporate or

individual." Dabney v. Chase Nat'l Bank, 196 F.2d 668, 671 (2d Cir. 1952). That BNYM has

only just recognized the import of Judge Hand's insight speaks volumes. But as the parties now

agree, New York law imposes on BNYM a mandatory duty to avoid conflicts of interest. And

this duty — grounded in New York common law and not the terms of the PSAs — lies at the

heart of the Article 77 Proceeding.[7]

       Despite its eventual recognition of its common law obligations as Trustee, BNYM

now argues that the terms of the PSAs have subsumed any New York duty to avoid conflicts of

interest. Because the PSAs impose on the trustee a duty to act "in good faith," BNYM contends

that it in fact does not owe any duties to the trust beneficiaries that are not contractually defined.

(Ingber Decl. Ex. A., Representative PSA dated November 1, 2006, §§ 8.01(iii), 8.02(ii).) But

---

[6] New York law also provides that an "indenture trustee may be liable in tort for failure to
perform basic non-discretionary ministerial tasks." LNC, 935 F.Supp. at 1347 (internal citations
omitted).

[7] While the parties agree that New York law imposes heightened duties on indenture trustees
following an "event of default," the parties disagree about whether a default has occurred here.
Because New York law imposes mandatory duties on BNYM even absent a default, this Court
expresses no opinion at this juncture regarding whether an "event of default" has taken place.

this argument collapses under its own weight. In its effort to prove that "good faith" encompasses the avoidance of conflicts, BNYM cites two cases in which courts explain what "good faith" means. See Boles v. Lanham, 17 Misc. 3d 1106(A), No. 17059/06, 2007 WL 2850987, at *1 (N.Y. Sup. Ct. Sept. 25, 2007); Rusyniak v. Gensini, 629 F. Supp. 2d 203, 224 (N.D.N.Y. 2009). It is no accident that BNYM relies on these decisions to give meaning to its contractual duty of "good faith." As BNYM conceded at oral argument, a court construing this obligation must look to New York common law. (Sept. 21 Hr'g Tr. at 13-14) ("MR. INGBER: You can look to New York law [to define 'good faith']. THE COURT: Where else would you look, Mr. Ingber? MR. INGBER: That's where you would look, your Honor.").

BNYM also argues that because its common law duties as trustee attach only as a result of the PSAs, the securities exception applies. But this circular reasoning expands the reach of the securities exception far beyond its boundaries. In Cardarelli, the Second Circuit held that the securities exception did not preclude removal of a suit brought by purchasers of certain money market certificates. See 527 F.3d at 26-27. While the parties in Cardarelli agreed that the certificates were "securities," the Court concluded that plaintiffs' state law fraud claims did not "enforce the rights of the Certificate holders as holders," and were therefore not subject to the securities exception. Cardarelli, 527 F.3d at 31-32. In reaching this conclusion, the Court expressly rejected the notion that the securities exception prevents removal of "any cause of action that relates to a security." Cardarelli, 527 F.3d at 31. The Court in Greenwich Financial applied this principle in holding that application of the securities exception depends on "the *source* of the right that the suit seeks to enforce." 603 F.3d at 30 (emphasis in original). In other words, federal jurisdiction is not precluded here simply because securities are at issue. While

18

Greenwich Financial may have expanded on Cardarelli, BNYM's proposed expansion of Greenwich Financial is a bridge too far. The PSAs are not talismans endowed with the power to ward off federal jurisdiction. Because the Article 77 Proceeding necessarily involves New York common law, the securities exception does not bar removal.

Nor does the Article 77 Proceeding "solely involve[]" a claim that is created by or pursuant to a security. 28 U.S.C. § 1453(d). In its Proposed Final Order and Judgment, BNYM asks the state court to determine whether "the Trustee has the authority, pursuant to the Governing Agreements *and applicable law* . . . to enter into the Settlement Agreement on behalf of all Trust Beneficiaries." (Proposed Final Order and Judgment at 4 (emphasis added).) BNYM also asks the state court to determine "pursuant to the Governing Agreements *and applicable law*, the decision whether to enter into the Settlement Agreement on behalf of all Trust Beneficiaries . . . is a matter within the Trustee's discretion." (Proposed Final Order and Judgment at 4 (emphasis added).) As these provisions demonstrate, the Article 77 Proceeding will necessarily test BNYM's compliance with New York law, and not simply the terms of the PSAs. In Greenwich Financial, the Second Circuit explained that "almost any securities claim under state law will necessarily 'involve' defenses — such as statutes of limitations — and collateral issues – such as state contract law." 603 F.3d at 31. But the role of New York common law in the Article 77 Proceeding is central, not merely "collateral." As such, BNYM has not carried its burden of establishing that this action "solely involves" a claim that is created by or pursuant to the PSAs. Accordingly, the securities exception does not apply.

II.    Remaining Issues

This Court recognizes the procedural difficulty inherent in continuing this action in federal court. But procedural complexity is not a ground for remanding an otherwise removable case. "The Federal Rules of Civil Procedure, like other provisions of federal law, govern the mode of proceedings in federal court after removal." Granny Goose Foods, Inc. v. Bhd. of Teamsters Local No. 70, 415 U.S. 423, 438 (1974) (citing Fed. R. Civ. P. 81(c)).

Due to the complexity of the procedural issues in this case, BNYM, Walnut Place, and the intervenors are directed to submit a joint case management report to this Court by October 31, 2011. This Court will conduct a status conference on November 3, 2011, at 11:00 a.m. to discuss how this matter will proceed in federal court.

CONCLUSION

The Settlement Agreement at issue here implicates core federal interests in the integrity of nationally chartered banks and the vitality of the national securities markets. See Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 10-11 (2003) (citing McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 413 (1819)) (describing the "special nature of federally chartered banks" and the "federal interest that protected national banks from the state taxation"); see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 78 (2006) ("The magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated.") A controversy touching on these paramount federal interests should proceed in federal court. And Congress enacted CAFA to provide a federal forum for such cases. See Cardarelli, 527 F.3d at 26.

For the foregoing reasons, this Court denies BNYM's motion to remand.

Dated: October 19, 2011
New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J

*All Counsel of Record*

21