UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the matter of the application of<br><br>THE BANK OF NEW YORK MELLON (as Trustee under various Pooling and Servicing Agreements and Indenture Trustee under various Indentures) *et al.*,<br><br>        Petitioners,<br><br>              -against-<br><br>WALNUT PLACE LLC *et al.*,<br><br>        Intervenor-Respondents. | **11-cv-5988(WHP)** |

## THE BANK OF NEW YORK MELLON'S
## <u>CONSOLIDATED RESPONSE TO OBJECTIONS</u>

| | |
|---|---|
| DECHERT LLP<br>Hector Gonzalez<br>James M. McGuire<br>1095 Avenue of the Americas<br>New York, New York 10036<br>(212) 698-3500 | MAYER BROWN LLP<br>Jason H. P. Kravitt<br>Matthew D. Ingber<br>1675 Broadway<br>New York, New York 10019<br>(212) 506-2500 |

*Attorneys for Petitioner*
*The Bank of New York Mellon*

# TABLE OF CONTENTS

**Page**

BACKGROUND ...................................................................................................................3

RESPONSE TO OBJECTIONS ..........................................................................................7

I.   There Is No Plausible Allegation of a Conflict of Interest. ................................8

II.   The Settlement Negotiations Were Not Secret. ................................................13

III.   Response to Objections Concerning the Scope of Releases. ............................16

    A.   Securities Claims Are Not Released. ...........................................................16

    B.   Pre-Existing Claims Against BNYM Are Not Released by the Settlement
        Agreement or the Proposed Final Order. ......................................................18

    C.   Release of Put-Back Claims...........................................................................19

IV.   Response to Objections Concerning Servicing Standards. ...............................21

V.   Response to Objections Concerning the Treatment of Particular Trusts or
    Investors...................................................................................................................25

    A.   The Distribution of Settlement Proceeds Through the PSA Waterfalls. ....................25

    B.   The Demand for an "Opt Out" Mechanism Should Be Rejected. ..............................30

    C.   The "Group Settlement" ...............................................................................32

CONCLUSION..................................................................................................................34

## TABLE OF AUTHORITIES

**Page**

<u>**CASES**</u>

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,
   11-cv-05236-MRP (MANx), 2011 WL 5067128 (C.D. Cal. Oct. 21, 2011)............................4

*Allstate Life Ins. Co. v. Robert W. Baird & Co., Inc.*,
   Nos. cv-09-8162-PCT-GMS, 2011 WL 5024269 (D. Ariz. Oct. 21, 2011) ...........................17

*ASR Levensverzekering NV v. Swiss Re Fin. Prods. Corp.*,
   Index No. 650557/09 (N.Y.Sup. Ct. Oct. 11, 2011) .................................................................25

*Asset Securitization Corp. v. Orix Capital Markets, LLC*,
   12 A.D.3d 215 (N.Y. App. Div. 2004) ....................................................................................17

*Bank of Am., N.A. v. AIG Fin. Prods. Corp.*,
   10-cv-05242(JSR), 2010 WL 506477 (S.D.N.Y. Dec. 7, 2010).........................................26, 27

*CFIP Master Fund, Ltd. v. Citibank, N.A.*,
   738 F. Supp. 2d 450 (S.D.N.Y. 2010).....................................................................................9, 13

*Craig v. Bank of N.Y.*
   59 F. App'x 388 (2d Cir. 2003) ...........................................................................................21, 24

*Cruden v. Bank of N.Y.*
   957 F.2d 961 (2d Cir. 1992)......................................................................................................20

*Elliot Assocs. v. J. Henry Schroder Bank & Trust Co.*,
   838 F.2d 66 (2d Cir. 1988)........................................................................................................13

*Greenwich Fin. Servs. Distressed Mtge. Fund 3, LLC v. Countrywide Fin. Corp.*,
   No. 650474/08, 2010 BL 316853 (N.Y. Sup. Ct. Oct. 07, 2010) ..................................7, 17, 25

*In re Application of IBJ Schroder Bank & Trust Co.*,
   No. 101530/98 (N.Y. Sup. Ct. Aug. 16, 2000) ......................................................................6, 30

*In re Bankers Trustee Co.*, No. 114077/1998
   (N.Y. Sup. Ct. Mar. 8, 1999) ...................................................................................................11

*In re Beiny*,
   No. 621-M/2502, 2009 WL 1050727 (N.Y. Sur. Ct. Apr. 20, 2009) .......................................31

*In re E.F. Hutton Sw. Props. II, Ltd.*,
   953 F.2d 963 (5th Cir. 1992) ...............................................................................................13, 14

*In re Greene*,
   88 A.D.2d 547 (N.Y. App. Div. 1982) .....................................................................................12

# TABLE OF AUTHORITIES

## (continued)

Page(s)

CASES (CONT'D)

*In re Hunter*,
  6 A.D.3d 117 (2d Dep't 2004), *aff'd*, 4 N.Y.3d 260 (2005) .....................................................18

*In re IBJ Schroder Bank & Trust Co.*,
  271 A.D.2d 322 (1st Dep't 2000) ..............................................................................................30

*In re Judicial Settlement of the First Intermediate Accounts of Proceedings of Cent.
  Hanover Bank & Trust Co.*,
  No. 9650/1952, 2008 WL 498080 (Sup. Ct. N.Y Cnty. Jan. 3, 2008)....................................19

*In re Smart World Techs., LLC*,
  423 F.3d 166 (2d Cir. 2005).............................................................................................30, 31

*Kusner v. First Pa. Corp.*,
  531 F.2d 1234 (3d Cir. 1976)...........................................................................................17, 26

*LaSalle Nat'l Bank Assoc. v. Lehman Bros. Holdings, Inc.*,
  237 F. Supp. 2d 618 (D. Md. 2002) ..........................................................................................17

*Maine Ret. Sys. v. Countrywide Fin. Corp.*,
  No. 10-cv-0302 MRP (MANx), 2011 WL 1765509 (C.D. Cal. Apr. 20, 2011).......................4

*Meckel v. Cont'l Res. Co.*,
  758 F.2d 811 (2d Cir. 1985 .......................................................................................................12

*Philip v. L.F. Rothschild & Co.*,
  No. 90 Civ. 0708 (WHP), 1999 WL 771354 (S.D.N.Y. Sept. 29, 1999) ...............................12

*Sterling Fed. Bank, F.S.B. v. DLJ Mortg. Capital, Inc.*,
  2010 WL 3324705 (N.D. Ill. Aug. 20, 2010) ...............................................................7, 17, 18

*Walnut Place LLC v. Countrywide Home Loans, Inc.*,
  No. 650497/2011 (Sup. Ct. N.Y. Cnty.) ...................................................................................14

STATUTES

N.Y. Est. Powers & Trusts 7–2.1(a) ................................................................................................31

N.Y. U.C.C. Section 8-301(1)..........................................................................................................28

OTHER AUTHORITIES

New York Disciplinary Rule 5-106 ..................................................................................................32

# TABLE OF AUTHORITIES

## (continued)

Page(s)

OTHER AUTHORITIES (CONT'D)

RESTATEMENT (SECOND) OF TRUSTS § 3 (1959) ...........................................................................31

RESTATEMENT (SECOND) OF TRUSTS § 31 (1959) .........................................................................31

RESTATEMENT (SECOND) OF TRUSTS § 87 (1959) .........................................................................11

RESTATEMENT (SECOND) OF TRUSTS § 186 (1959) .......................................................................30

RESTATEMENT (SECOND) OF TRUSTS § 192 (1959) ...................................................................7, 30

RESTATEMENT (THIRD) OF TRUSTS § 187 (2007) ...........................................................................6

Pursuant to the July 29, 2011 Order the Honorable Barbara R. Kapnick issued prior to the removal of this proceeding ("Preliminary Order"), petitioner The Bank of New York Mellon ("BNYM") submits its response to the Settlement objections that have been filed in this matter.

## INTRODUCTION

The Preliminary Order directs Potentially Interested Persons who object to the Settlement and/or the Proposed Final Order and Judgment to file by August 30, 2011 "a detailed statement of such Potentially Interested Person's objection to any matters before the Court and the grounds therefor . . . ."[1]  Ex. A at 4.[2]  On August 5, 2011, Justice Kapnick issued a second order (the "Supplemental Order") modifying, in part, the Preliminary Order.   Specifically, the Supplemental Order states that any

> Potentially Interested Person who wishes to object to the Settlement may file with the Court, on or before August 30, 2011, a written notice of intention to appear and object . . . , except that they need not provide a detailed statement of their objection, but may just state the grounds for their objection, one of which may be that such Potentially Interested Person does not have enough information to evaluate the Settlement.

The Supplemental Order further states that the "filing of a written notice by a Potentially Interested Person as described above shall preserve all rights of such Potentially Interested Person to seek discovery and to supplement its objection to the Settlement as need be."  Ex. B at 2.  The purpose of the Supplemental Order was to provide for the exchange of discovery before Potentially Interested Persons were required to submit a substantive objection.

Although the Settlement concerns 530 trusts, in which it is likely that many *thousands* of investors are believed to hold interests, only forty-four objections have been filed.  Of those 44

---

[1]      "Potentially Interested Persons" is defined in the Affirmation of Matthew D. Ingber, dated June 28, 2011 (Sup. Ct. Dkt. 11) and refers to the various entities that may have an interest in the subject matter of BNYM's Verified Petition.  References to "Dkt." are to docket numbers in this Court; "Sup. Ct. Dkt." refers to the docket in state court.

[2]      An Addendum of exhibits is filed herewith.  "Ex." cites herein refer to the Addendum.

objections, 22 ask only for additional information about the Settlement before reaching a judgment on the Trustee's decision to enter into it.[3]  These entities stated generally that they "did not have sufficient information to evaluate the Settlement" and reserved "all of their rights, including the right to supplement and/or amend [their] objection based on additional information they may receive."  *See* Dkt. 19; *see also* Dkt. 4, 5, 6, 7, 9.[4]

One of the 22 requests for more information is a "conditional objection" filed by the Federal Housing Finance Agency (FHFA), the conservator of Freddie Mac and Fannie Mae, which is generally regarded as highly knowledgeable about the settled claims.  That filing, dated August 30, 2011, identifies aspects of the Settlement that the FHFA views as "positive," including the servicing improvements and documentation cures.  The statement then explains that the FHFA filed its conditional objection to obtain information developed in discovery and "to be in a position to voice a substantive objection to the Settlement, should a now unforeseen issue arise that is to the detriment of" Freddie Mac or Fannie Mae.  FHFA Conditional Obj. 2 (Dkt. 15).  In connection with the statement, FHFA issued a press release stating that "[FHFA] is

---

[3]      These objections seeking only additional information were filed by:  America Equity Investment Life Insurance Co. *et al.*, Ballantyne Re PLC, Blue Mountain Credit Alternative Master Fund LP, CIFG Assurance North America, Inc., Cranberry Park LLC *et al.*, Federal Deposit Insurance Corporation, Federal Housing Finance Agency, First Reliance Standard Life Insurance Co., Goldman Sachs & Co. Securities Division, Good Hill Partners LP, Liberty View LLC, Maine State Retirement System, Mortgage Bond Portfolio LLC, National Credit Union Administration Board, Oriental Bank and Trust, Pine River Master Fund, *et al.*, Platinum Underwriters Re *et al.*, Reliance Standard Life Insurance Co., RMBS Acquisition Co. LLC, Safety National Casualty Corporation, Stone Creek LLC, Sun Life Assurance Co. of Canada (U.S.), and Syncora Guarantee Inc.

[4]      BNYM reserves its right to supplement and/or amend its response if these Potentially Interested Persons choose to submit substantive objections, or if other objectors are permitted to supplement previously filed objections.

aware of no basis upon which it would raise a substantive objection to the Settlement at this time."[5]

## **BACKGROUND**

BNYM serves as trustee under various Pooling and Servicing Agreements and Indenture Trustee under various Indentures for 530 residential mortgage-backed securitization trusts ("Trusts"), which purchased mortgage loans from Countrywide Home Loans, Inc. and related parties (the "Seller").  The loans are serviced by a Master Servicer, Bank of America, N.A. (and formerly Countrywide Home Loans Servicing, LP).[6]   In 2010, a group of some of the largest investors in the world, including funds run by the Federal Reserve Bank of New York, major life insurance companies and asset managers, and several major financial institutions (the "Institutional Investors")—investors who held tens of billions of dollars' worth of interests in the Trusts—approached BNYM and alleged that the Seller and Master Servicer had breached the governing Pooling and Servicing Agreements and Sale and Servicing Agreements ("PSAs").[7] Despite their enormous holdings, the Institutional Investors understood that they could not pursue legal claims directly against the Seller or Master Servicer.  Under Section 10.08 of the PSAs and Section 5.06 of the Indentures, they were required first to seek action by the Trustee.

---

[5]      A copy of the FHFA press release is attached as Exhibit C.

[6]      Countrywide Home Loans Servicing, LP was renamed BAC Home Loans Servicing, LP ("BAC HLS") after Bank of America Corporation ("Bank of America") acquired Countrywide. Shortly after the parties entered into the Settlement Agreement, BAC HLS merged into Bank of America, N.A., which is now the Master Servicer.

[7]      Unless the context requires specificity, we refer to the Pooling and Servicing Agreements, the Sale and Servicing Agreements, and the Indentures collectively as the "PSAs" and cite to provisions in the sample PSA that was filed in this proceeding.

At the time, no other investor with sufficient holdings had sought to instruct BNYM to take legal action against Countrywide or Bank of America relating to their alleged breaches of the PSAs.[8]

In November 2010, BNYM and the Institutional Investors began lengthy negotiations with Countrywide and its parent, Bank of America, to reach a settlement of those claims.  BNYM and the Institutional Investors recognized the obstacles to litigating; in similar cases, defendants have argued, with some success, that mortgage-origination and servicing claims must be litigated on a loan-by-loan basis, a process that could take years and consume enormous resources in light of the hundreds of thousands of loans (at the very least) in the 530 Trusts.  Even undertaking a more precise valuation of the potential claims could require a similarly lengthy and expensive process to determine which loans could be the subject of recovery.  BNYM also would face legal uncertainty surrounding the Seller's obligation to repurchase loans that did not conform to contractual representations and warranties, which is the Trusts' sole remedy for non-conforming loans (*see* PSA § 2.03)—in particular, the repurchase obligations could be subject to largely untested causation and materiality requirements.  And even if Certificateholders could instruct and indemnify BNYM, and together achieve victory in the courtroom, BNYM faced a potentially bankrupt contract counterparty in Countrywide.  Some plaintiffs had attempted to reach beyond Countrywide and recover from Bank of America, but those efforts had largely been unsuccessful, foundering on successor liability rules.  *See Maine Ret. Sys. v. Countrywide Fin. Corp.*, No. 10-cv-0302 MRP (MANx), 2011 WL 1765509, at *8-*9 (C.D. Cal. Apr. 20, 2011); *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 11-cv-05236-MRP (MANx), 2011 WL 5067128, at *23 (C.D. Cal. Oct. 21, 2011).

---

[8]     The PSAs are clear that the Trustee has no duty to act against the Seller or Master Servicer unless instructed to do so by Certificateholders representing at least 25% of the Voting Rights of each trust (or in some cases, each Class of Certificates or Notes), and offered an adequate indemnity.  PSA §§ 8.01, 8.02(iv).

In light of these obstacles to recovery in litigation, BNYM and the Institutional Investors negotiated the Settlement with Countrywide and Bank of America.  In exchange for a release of loan-repurchase claims, servicing claims, and document deficiency claims, Countrywide **_and_** Bank of America agreed to three main forms of consideration:

- The payment, guaranteed by Bank of America, of $8.5 billion;

- Improvements in Countrywide's mortgage servicing procedures, including transfer of high-risk loans to specialty subservicers whose compensation is based on performance, criteria for loan modification, monthly comparisons of the Master Servicer's performance against industry standard benchmarks, and servicing fee adjustments where the Master Servicer's performance fails to satisfy those benchmarks; and

- An agreement by the Master Servicer to indemnify the Trusts (not the Trustee) against certain losses caused by a failure by the Seller to deliver mortgage loan files in the proper form.  Specifically, the Master Servicer agreed to cover any losses that resulted from an inability to foreclose as a first-lien holder due to certain document deficiencies.

BNYM evaluated the proposed settlement terms.  In accordance with the express terms of the PSAs, it retained outside financial and legal advisors to opine on various aspects of the Settlement.  BNYM requested and received a report attempting to value its claims against Countrywide, based on data from the Trusts, information presented by the Institutional Investors and Bank of America and Countrywide during settlement negotiations, and publicly available information.  That report concluded (based on an estimation of losses) that the claims, without discounting for legal defenses including causation and corporate separateness, were worth between $8.8 and $11 billion.  But that was only one relevant consideration.  Perhaps more importantly, BNYM considered an outside valuation of Countrywide, which concluded that a judgment creditor of Countrywide could recover a _maximum_ of $4.8 billion, a number that would decline over time as the company continued to expend cash.  And BNYM received opinions from law professors warning that BNYM might have to prove that the breach of a representation

and warranty was the actual cause of loss to the Certificateholders—as opposed to, say, the loss of a borrower's job or the macro-economic problems facing the country—and that proving successor liability against Bank of America would be difficult.  Finally, BNYM received a separate report, which concluded that each of the proposed servicing improvements either met or exceeded industry standards.  In short, BNYM did exactly what it was supposed to do—seek advice from experts, weigh that advice, and make a good faith determination about whether to enter into the Settlement.[9]  Based on the foregoing information and advice; the strong support from the Institutional Investors, who had tens of billions of dollars of holdings in the Trusts; the concrete and substantial benefit to hundreds of Trusts that might otherwise receive nothing; and the lack of any reasonable litigation alternative for pursuing and recovering from Countrywide, let alone Bank of America, BNYM decided to enter into the Settlement Agreement.

This agreement, however, is contingent on receiving judicial approval of the Settlement. The Settlement Agreement will not become effective unless a court confirms that the decision to enter into the Settlement was reasonable and in good faith and within the Trustee's discretion under the PSAs.[10]  If the Court concludes otherwise, then the Settlement Agreement will automatically become void, and the Trusts' rights will be unaffected.  (Indeed, the Settlement Agreement expressly tolls the statute of limitations applicable to the released claims.)  BNYM filed a proceeding pursuant to Article 77 of the New York C.P.L.R., which provides a

---

[9]     The outside opinions are attached as Exhibit D-1 through D-5.

[10]    *See* Proposed Order and Final Judgment ¶ k (Sup. Ct. Dkt. 7); Trustee Petition ¶ 58 (Sup. Ct. Dkt. 1).  The law is clear that a trustee's decision to settle is entitled to deference. RESTATEMENT (THIRD) OF TRUSTS § 187 (2007); *see also In re Application of IBJ Schroder Bank & Trust Co.*, No. 101530/98, slip op. at 6 (N.Y. Sup. Ct. N.Y. Cnty. Aug. 16, 2000) (in an Article 77 proceeding involving a securitization trust, holding that the trustee's decision to compromise was "entitled to judicial deference" and that "the trustee's view must prevail" because of "the trustee's showing of [its] reasonableness").

mechanism to hear such a request, to give all trust beneficiaries the opportunity to be heard, and to resolve these questions conclusively. *See also* RESTATEMENT (SECOND) OF TRUSTS § 192 cmt. d (1959) ("If the trustee is in doubt whether he should compromise or submit to arbitration a claim, he may ask the instruction of the court or he may agree thereto conditionally upon the subsequent approval of the court.").

## RESPONSE TO OBJECTIONS

The principal substantive objections are factually inaccurate, legally baseless, or simply irrelevant to the question of whether BNYM acted in good faith and within the bounds of reasonable judgment when it entered into the Settlement on behalf of the Trusts.

*None* of the objectors suggest any possible route by which investors in the Trusts could obtain any benefit or remedy through a vehicle other than the Settlement—be it litigation or otherwise. They identify no viable alternative route to recovering money from Countrywide— much less an amount that exceeds $8.5 billion. In fact, the only examples of any repurchase claims attempted to be brought by a Certificateholder in any form are currently subject to motions to dismiss, and similar claims have been dismissed already. *See Greenwich Fin. Servs. Distressed Mtge. Fund 3, LLC v. Countrywide Fin. Corp.*, No. 650474/08, 2010 BL 316853, at *6-*7 (N.Y. Sup. Ct. Oct. 07, 2010); *Sterling Fed. Bank, F.S.B. v. DLJ Mortg. Capital, Inc.*, No. 09C 6904, 2010 WL 3324705, at *3-*5 (N.D. Ill. Aug. 20, 2010). And it is difficult to conceive of a scenario in which investors could ever obtain in litigation the servicing improvements or document cures that the Settlement Agreement provides. The Trustee's decision is especially reasonable in light of the substantial doubt that litigation can even proceed for many Trusts should the Settlement not be approved. Thus, even if the objectors could show that the Settlement is inferior to some hypothetical litigation (involving these Trusts) that no investor is

willing to fund, that would not have been a basis to reject the Settlement Agreement. The Court should find that the Trustee's decision was within the bounds of reasonableness.

**I.      There Is No Plausible Allegation of a Conflict of Interest.**

Some Certificateholders have objected that BNYM had a conflict of interest because, among other things, (i) it "negotiated for itself an indemnity from Countrywide that goes well beyond the scope of the indemnity that BNYM is otherwise entitled to under the PSAs" (Walnut Place Pet. (Sup. Ct. Dkt. 24) ¶ 20); (ii) it is "very unusual" for a trustee to demand and receive an indemnity from the party that is adverse to the Trusts and its Certificateholders (*id.*); (iii) it received a guaranty from Bank of America, BAC HLS's parent, of BAC HLS's indemnity obligations to BNYM that "puts BNYM in a substantially better position than it was before negotiating the proposed settlement, at the direct expense of the certificateholders whose interests BNYM purports to protect" (*id.* ¶ 21); *see also* Western and Southern life insurance Entities Petition (Sup. Ct. Dkt. 85) ¶ 7); (iv) it "has a significant ongoing relationship with" Bank of America and receives "more than 60 percent of [its] trustee business from" it, which allegedly "provides a powerful incentive for the Trustee to defer to Bank of America to the disadvantage of investors" (Western and Southern Life Insurance Entities Petition (Sup. Ct. Dkt. 131) ¶ 7; AIG Pet. (Sup. Ct. Dkt. 131) ¶ 27); and (v) investors' interests and preferences differ (AIG Pet. ¶ 6(a)). These contentions fundamentally mischaracterize the existing contracts, the Settlement Agreement, and governing law.

*First*, it is absolutely fundamental that trustees in mortgage-securitization trusts are not expected or required to expend their own funds or risk liability. That well-settled principle permeates the PSAs and is consistent with the nature of a trustee's duties and the economics of a mortgage-securitization transaction. *See* PSA (Dkt. 56) § 8.02(vi) ("the Trustee shall not be required to risk or expend its own funds or otherwise incur any financial liability in the

performance of any of its duties or in the exercise of any of its rights or powers hereunder if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk is not assured to it"); § 8.02(ix) ("the Trustee shall be under no obligation to exercise any of the trusts, rights or powers vested in it by this Agreement or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of any of the Certificateholders, . . . , unless such Certificateholders shall have offered to the Trustee reasonable security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which may be incurred therein or thereby"); *see also CFIP Master Fund, Ltd. v. Citibank, N.A.*, 738 F. Supp. 2d 450, 475 (S.D.N.Y. 2010) ("As to the indemnifications, the trust agreements make clear that the Trustee was not expected to expend its own funds or risk liability . . . so it was reasonable for U.S. Bank to seek indemnification once it became clear that there was a dispute.").

*Second*, the side letter with BAC HLS (and now Bank of America, N.A.), which is attached to the Settlement Agreement for everyone to see, does not expand the indemnity.  It simply "confirms" that the broad indemnity language of the PSAs already "covers actions taken by [BNYM] in connection with its entry into the Settlement."  Sup. Ct. Dkt. 3.  That preexisting indemnity, found in Section 8.05 of the PSAs, is restated verbatim in the letter:

> The Trustee . . . shall be indemnified by the Master Servicer [BAC HLS] and held harmless against any loss, liability or expense (including reasonable attorney's fees and expenses) (i) incurred in connection with any claim or legal action relating to (a) this [PSA], (b) the Certificates or (c) in connection with the performance of any of the Trustee's duties hereunder[.]

PSA § 8.05.

The side letter provides nothing new.  Nor does the Settlement Agreement or the side letter modify the indemnity in the Governing Agreements, including its express carve-out for

9

"negligence, bad faith, or willful misconduct." *See* PSA § 8.05.[11]  BNYM is settling claims relating to and arising out of the PSAs.  That conduct falls squarely within the existing indemnity.  Accordingly, the indemnity from the Master Servicer is no more than BNYM is already entitled to.

*Third*, although Bank of America has agreed to guaranty the indemnity, that guaranty applies only to the loss, liability, or expense (if any) incurred by BNYM by virtue of its entry into the Settlement.  BNYM already was entitled to that indemnity and guaranty pursuant to Section 8.02(vi) of the PSAs and Section 6.01(f) of the Indentures, which expressly excuses it from "risk[ing] or expend[ing] its own funds or otherwise incur[ring] any financial liability in the performance of any of its duties or in the exercise of any of its rights or powers" under the PSAs and Indentures, if "adequate indemnity against such risk of liability is not assured to it."  In any event, the indemnity applies only to losses, liabilities, and expenses arising out of the Settlement—losses, liabilities, and expenses that easily could have been avoided by not agreeing to the Settlement in the first place.  By its express terms, the guaranty does not extend beyond the Settlement.  In short, there is no scenario in which the guaranty results in a net financial gain to the Trustee.

*Fourth*, the objection that BNYM is "in a substantially better position" because the indemnity is guaranteed by Bank of America is based on the misconception that Countrywide is the Master Servicer.  It is not.  At the time of the guaranty, BAC HLS was the Master Servicer,

---

[11]     Some objectors claim that the side letter offers a financial benefit to BNYM because it supposedly shields it from liability for breach of fiduciary duty.  *See* Walnut Place LLC Pet. (Sup. Ct. Dkt. 24) at 7 & n.4; Policemen's Fund Reply (Sup. Ct. Dkt. 59) at 5.  That is also false. Section 8.05 of the PSAs excludes from its scope "any loss, liability or expense incurred by reason of willful misfeasance, bad faith or negligence in the performance of any of the Trustee's duties hereunder."  That same carve-out is contained in the side letter.  The side letter, therefore, provides no more and no less than the PSA indemnity.

and Bank of America has at all relevant times been financially responsible for BAC HLS's obligations, which includes its indemnity to BNYM.  This fact is clearly stated in publicly filed documents.   Immediately after Bank of America's acquisition of Countrywide Financial Corporation on July 1, 2008, Countrywide Financial Corporation transferred its ownership interests in Countrywide Home Loans Servicing, LP to Bank of America, N.A., and the Master Servicer was subsequently renamed BAC Home Loans Servicing, LP.   This transaction was publicly disclosed in Countrywide Financial Corporation's Form 10-Q, dated August 11, 2008. *See* Countrywide Financial Corporation's Form 10-Q, dated August 11, 2008, at 6, 33 (Ex. E). The indemnity has thus long been an obligation of an entity for which Bank of America is financially responsible.   The guaranty does not make the preexisting indemnity more valuable, and because BNYM is no better off than it would be without the Settlement, the guaranty (and the indemnity) could not logically have been—and unquestionably was not—a financial inducement for BNYM to enter into the Settlement.

*Fifth*, AIG contends that BNYM has an "admitted conflict of interest" because it acknowledged that some investors support the settlement and others do not.  AIG Pet. ¶ 6(a); ¶ 19 ("BoNY concedes that it has 'real and substantial conflicts' because different groups of trust beneficiaries want BoNY to resolve BAC's RMBS liability differently").   That completely distorts the Trustee's petition.  The fact that *investors* may have divergent interests or opinions comes nowhere near suggesting that *BNYM's* interests conflict with those of the Trusts.  As the *Restatement* puts it, a court may "control the trustee in the exercise of a power" only where BNYM "acts from a motive other than to further the purposes of the trust."  RESTATEMENT (SECOND) OF TRUSTS § 87 cmt. g (1959).  Similarly, Section 183 acknowledges that beneficiaries may have divergent or opposed interests. *See also In re Bankers Trustee Co.*, No. 114077/1998,

at 2-3 (N.Y. Sup. Ct. Mar. 8, 1999) (granting trustee's Article 77 request for instruction regarding distribution of trust funds that were subject to conflicting letters of direction from beneficiaries); *In re Greene*, 88 A.D.2d 547, 548 (N.Y. App. Div. 1982) (Article 77 is "broadly construed to cover any matter of interest to trustee, beneficiaries or *adverse claimants* concerning the trust") (emphasis added).  No authority holds that a trustee is subject to a disabling "conflict of interest" merely because beneficiaries disagree.  If that were the case, then any decision by the Trustee, to settle or not to settle, to litigate, or to do nothing at all, would be equally improper.  The only option would be to submit the trust to a court, but AIG says that would have been "improper" as well.  AIG Pet. ¶ 6.[12]

    *Finally,* some objectors claim that BNYM is conflicted because it "has a significant ongoing relationship with" Bank of America and receives "more than 60 percent of [its] trustee business from" Bank of America.[13]  If the objectors are correct, then any indenture trustee appointed to administer securitized trusts, who necessarily will have a "business relationship"

---

[12]    AIG also asserts that BNYM is a "fiduciary."  AIG Pet. ¶ 11.  As this Court has held, however, before an event of default, indenture trustees do not have the same duties as the ordinary trustees described in the cases cited by AIG.  *See Philip v. L.F. Rothschild & Co.*, No. 90 Civ. 0708 (WHP), 1999 WL 771354, at *1 (S.D.N.Y. Sept. 29, 1999) (Pauley, J.) ("An indenture trustee is not subject to the ordinary trustee's duty of undivided loyalty.  Unlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement.") (quoting *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985)).  AIG does assert that an Event of Default under Article 7 of the PSAs has occurred, describing an Event of Default as "when the master servicer . . . breaches certain of its obligations."  *Id.* at 11.  But that is wrong—a mere breach by the Master Servicer is not an Event of Default unless, (a) two separate materiality thresholds are satisfied, (b) notice has been given, and (c) a cure period has expired.  *See* PSA § 7.01.  Further, the PSAs expressly provide that the duty of care expected of the Trustee does not change until the Trustee has received "written notice" of the Event of Default.  AIG acknowledges some of these requirements, but never explains how they were met.

[13]    This assertion is inaccurate.  BNYM is trustee for many of Countrywide RMBS securitizations, but Countrywide and Bank of America do not account for 60% of BNYM's "trust business."

with the seller who created the trusts, will be conflicted and disqualified from performing its duties.  Not surprisingly, in considering similar allegations, courts have disregarded those allegations as "'bald assertions of conflict,' and . . . instead required a showing that the trustee 'personally benefitted' from the disputed action."  *CFIP Master Fund, Ltd.*, 738 F. Supp. 2d at 475 (rejecting allegations that indenture trustee had a conflict of interest because it was a trustee for other deals with the same issuer) (quoting *Elliot Assocs. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 70 (2d Cir. 1988)); *see also In re E.F. Hutton Sw. Props. II, Ltd.*, 953 F.2d 963, 972 (5th Cir. 1992) (observing that the Second Circuit does not "take into account . . . hypothetical possibilities of conflict," and concluding that "[a] mere hypothetical possibility that the indenture trustee might favor the interests of the issuer merely because the former is an indenture trustee does not suffice" to allege a conflict).  In any event, this alleged conflict, and all the others alleged by the objectors, are *all* hypothetical.  They never existed.  And most importantly, in making its decision to enter the Settlement, BNYM never viewed itself as benefiting financially—or otherwise—from the Settlement.  It was a decision that BNYM made based on what it viewed, in its good faith judgment, as in the best interests of the Trusts. Nothing more.

## II.    The Settlement Negotiations Were Not Secret.

Several objectors have asserted that BNYM "secretly negotiated" a deal with Countrywide and Bank of America that was not disclosed until June 29, 2011, when BNYM filed its Verified Petition.  *See, e.g.*, Walnut Place Pet. (Sup. Ct. Dkt. 24) ¶¶ 7-8, 18; AIG Pet. ¶¶ 5-6, 7.  The objection seems to be premised on the contention that, according to the objectors, BNYM never sought to solicit the views of all Certificateholders in the Trusts.  Walnut Place Pet. ¶ 7.

There are presumably thousands of Certificateholders in the trusts.  Because they hold their Certificates in the name of the Depository Trust Company ("DTC"), or its nominee, BNYM does

not even know their identities. Soliciting the views of thousands of Certificateholders and inviting them all to participate in complicated and contentious settlement negotiations would have been completely impractical and is not required by the PSAs or by trust law. It is not an overstatement that no settlement could be achieved under those circumstances. Instead, BNYM did what the *Restatement*, among other authorities, says that trustees should do—it exercised its good faith judgment to enter into the Settlement, in part based on the views of investors with the requisite holdings to direct BNYM to act, and then filed a proceeding to allow other interested Certificateholders to object to or support the Settlement. The notion that Certificateholders have no voice is belied by the existence of this very proceeding, which follows a robust and extensive notice program and has given all Certificateholders an opportunity to be heard.[14]

As it turns out, during the relevant period, Walnut Place—a principal advocate of this "secrecy" objection—was the only other Certificateholder that sought to address alleged breaches of the PSAs, *and* that claimed to hold a sufficient percentage of Voting Rights to direct BNYM to take legal action. Walnut Place was well aware that settlement discussions were underway—its counsel was quoted in published articles making comments about the settlement discussions (*see* Sup. Ct. Dkt. 44 at Exs. D, E (Exs. F, I hereto))—and if that were not enough, BNYM, Bank of America and Countrywide actually told Walnut Place that they were negotiating a settlement. Sup. Ct. Dkt. 44 ¶ 10. They offered to report to Walnut Place on a current and ongoing basis about settlement discussions, and to provide confidential information that the parties were evaluating in connection with the settlement. *Id.* And they invited Walnut Place to provide input on settlement discussions. *Id.* Walnut Place refused, and chose instead to file a lawsuit asserting claims against Countrywide, Bank of America and BNYM (as nominal

---

[14]     *See* Ex. A (Preliminary Order).

defendant) that are intended to be released by the Settlement. *See Walnut Place LLC v. Countrywide Home Loans, Inc.*, No. 650497/2011 (Sup. Ct. N.Y. Cnty.).

Given this background, Walnut Place's after-the-fact contention that "neither BNYM nor Bank of America ever informed it or its counsel that BNYM was participating *directly* in any settlement negotiations" is surprising. The notion that Walnut Place was unaware of BNYM's involvement also is belied by the statements that Walnut Place's counsel made in February 2011, threatening to sue BNYM for its participation in settlement discussions. *See* Ex. F, Debtwire, *PIMCO, Blackrock and BofA settlement could bind other CFC RMBS investors* (Feb. 15, 2011) ("Grais & Ellsworth . . . is looking into the potential for recourse against the trustee for the affected deals, Bank of New York Mellon, in case it participates in the settlement"), Ex. G, Bank of America press release (Dec. 15, 2011).

Finally, Walnut Place's assertion that it was not aware that the negotiations involved any of the Trusts in which it is a Certificateholder (Walnut Place Reply at 5 (Sup. Ct. Doc. 49) is refuted by its own admissions. Walnut Place's counsel stated at the August 5, 2011 hearing in this proceeding that "the express purpose" behind the filing of its February 2011 lawsuit against Countrywide and BNYM was "to stop the settlement" from extinguishing Walnut Place's claims.[15] Obviously, that could not have been Walnut Place's "express purpose" if it was unaware that the settlement discussions included the few Trusts in which it owns positions. And contemporaneous public statements by Walnut Place's counsel also reflect that it fully understood that the ongoing settlement negotiations could result in an agreement that would bind "all" Countrywide Certificateholders. Indeed, in an article appearing on February 23, 2011, David Grais, of Grais & Ellsworth, counsel for Walnut Place, was quoted as stating that an

---

[15]     Ex. H (Transcript of August 5, 2011 hearing) at 33:20-23.

agreement among the negotiating parties "could bind all non-agency mortgage backed securities issued by Countrywide, BofA and potentially Merrill Lynch."  Ex. I.

In short, the settlement negotiations were hardly a secret.  The negotiations were widely reported in the press, and the public statements by Bank of America, the Institutional Investors—and even some of the objectors' counsel—are dispositive of this issue.  *See* Ex. G (December 15, 2010 Bank of America Press Release); Ex. J (Gibbs & Bruns LLP January 28, 2011 Press Release); Ex. K (Gibbs & Bruns LLP March 31, 2011 Press Release).

## III.  Response to Objections Concerning the Scope of Releases.

Several parties object to the releases in the Settlement Agreement.  These objections baldly, and badly, misstate the terms of those releases and consequently object to a fictional settlement that is not before the Court.

### A.  Securities Claims Are Not Released.

U.S. Debt Recovery asserts that "[t]he original securitization of many loans by Countrywide failed, resulting in securities law violations."  USDR Obj. (Dkt. 14) 8.  That may or may not be true, but it is irrelevant here because the Settlement Agreement does not release those claims.  Section 10, "Claims Not Released," provides that:

> (c)  <u>Certain Individual Investor Claims.</u>  The release and waiver in Paragraph 9 does not include any direct claims held by Investors or their clients that do not seek to enforce any rights under the terms of the Governing Agreements but rather are based on disclosures made (or failed to be made) in connection with their decision to purchase, sell, or hold securities issued by any Covered Trust, ***including claims under the securities or anti-fraud laws of the United States or any state***

Settlement Agreement ("SA") (Dkt. 1-6) § 10(c) (emphasis added).

Nor could the Settlement Agreement release securities claims, because those claims do not belong to the Trustee.  The release of claims under the PSAs, by contrast, is not made by BNYM in some representative capacity; BNYM can release those claims because BNYM itself is a party

to the PSAs, and any causes of action under the PSAs belong to it.  *See* PSA § 2.01(b)   It is well established that securities claims belong to individual investors and not trustees.  *E.g.*, *Kusner v. First Pa. Corp.*, 531 F.2d 1234, 1236–37 (3d Cir. 1976); *Allstate Life Ins. Co. v. Robert W. Baird & Co., Inc.*, Nos. cv-09-8162-PCT-GMS, 2011 WL 5024269, at *3 (D. Ariz. Oct. 21, 2011)  And it is equally well established that claims arising from trust property belong to BNYM.  *See also LaSalle Nat'l Bank Assoc. v. Lehman Bros. Holdings, Inc.*, 237 F. Supp. 2d 618, 633 (D. Md. 2002) ("Section 2.01 of the PSA in this case, when read together with other provisions of the PSA, grants [the trustee] the authority to institute this action as the real party in interest").  As a result, individual investors do not have the power to bring these claims.  *See Asset Securitization Corp. v. Orix Capital Markets, LLC*, 12 A.D.3d 215, 215 (1st Dep't 2004) ("authority [to commence litigation under PSAs on behalf of Certificateholders] is committed solely to the trustee of the pooled loans"); *Greenwich Fin. Servs.* 2010 BL 316853, at *6-*7; *Sterling Fed. Bank*, 2010 WL 3324705, at *3-*5.  This objection is a red herring.

Another objector—The Retirement Board of the Policemen's Annuity and Benefit Fund ("Policemen's Fund")—acknowledges that the release does not cover securities claims, but objects that the Agreement "fails to address the securities claims asserted in the class action securities lawsuits that are currently pending before the Hon. Mariana Pfaelzer in the United States District Court for the Central District of California."  Sup. Ct. Dkt. 32, at 5.  If, as the Policemen's Fund asserts, those "securities lawsuits" before Judge Pfaelzer involve "securities claims," then the Settlement Agreement does indeed address them, in Section 10(c).  They are not released.

**B. Pre-Existing Claims Against BNYM Are Not Released by the Settlement Agreement or the Proposed Final Order.**

Some Certificateholders have objected that BNYM operated under a conflict of interest because it secured a "far-reaching release from all of its beneficiaries, including those who have not been allowed to participate in the settlement negotiations or decision-making." AIG Pet. ¶ 22. That is false: BNYM has received no release whatsoever. Objectors seem to be referring to the Proposed Final Order and Judgment—which is not a "release," but a proposed finding, which the court can accept only after a hearing and presentation of evidence—which proposes, among other things, that "Trust Beneficiaries . . . are hereby (i) permanently barred and enjoined from instituting . . . any suit . . . arising from or in connection with the Trustee's entry into the Settlement . . . ." Proposed Final Order and Judgment (Dkt. 1-10) ¶ o. Entry of the Proposed Final Order and Judgment would require another proposed finding—that BNYM "acted in good faith, within its discretion, and within the bounds of reasonableness in determining that the Settlement Agreement was in the best interests of the Covered Trusts." *Id.* ¶ k. The Court either will approve the Settlement because BNYM acted in good faith and within the bounds of reasonableness, or it will not. If it approves the Settlement, the Court's judgment will have *res judicata* effect, there will be no conceivable claim that could arise out of the Trustee's decision to enter into the Settlement Agreement. If the Court does not approve the Settlement, there will be no Final Order and Judgment, there will be no bar order, and all interested parties will resume their pre-Settlement positions. The Final Order and Judgment would merely confirm what the law already provides—namely, that if the Court determines that BNYM acted within the bounds of reasonableness, and approves the Settlement, that determination will be final for all purposes and binding on all Certificateholders. *See In re Hunter,* 6 A.D.3d 117, 121-22 (2d Dep't 2004), *aff'd*, 4 N.Y.3d 260 (2005) ("every decree whether upon an accounting or otherwise is binding

upon all persons over whom jurisdiction was obtained"); *In re Judicial Settlement of the First Intermediate Accounts of Proceedings of Cent. Hanover Bank and Trust Co.*, No. 9650/1952, 2008 WL 498080, at *5 (Sup. Ct. N.Y Cnty. Jan. 3, 2008) (jurisdiction established where trustee submitted unrebutted proof that it mailed notice of proceedings to petitioners).

Finally, one of the objectors accuses BNYM of including the purported "release" only in the Proposed Final Order and Judgment, and not in the Settlement Agreement, because "no one would look there."  AIG Pet. (Sup. Ct. Dkt. 131) ¶ 23.  That is absurd.  It was not in the Settlement Agreement because the parties to that agreement are BNYM, as Trustee, and various Bank of America and Countrywide entities.  Those parties have not attempted to release any claims against BNYM and could not release investors' claims even if they wanted to.  If BNYM were trying to shield the Settlement (or some counterfactual release) from public scrutiny, it would have executed the Settlement Agreement without commencing this proceeding, and without the massive program of notice to investors.  It would not have attached to its Petition the Settlement Agreement, the Proposed Final Order and Judgment, or the side letter confirming BNYM's indemnity.  And it would not have created and maintained a website that contains every one of these documents, and others.

### C.  Release of Put-Back Claims.

U.S. Debt Recovery objects that the Settlement would be unreasonable if BNYM has not "fulfilled its duties in properly 'Putting Back' to Bank of America all appropriate liabilities." USDR Obj. 5.  This objection (as we understand it) is irrelevant for several reasons.  First, the objector does not identify any source of the purported "duty" to put back loans, and there is none.  PSA (Dkt. 56) § 8.02(ix); Indenture § 6.01(f).[16]  Second, it is difficult to understand what

---

[16]     Even if there were such a duty, the Settlement Agreement does not release any claims against the Trustee.  *See supra* Part III.B.  It is a *non sequitur* to conclude that the Settlement

U.S. Debt Recovery expects BNYM to do.  The Settlement results from negotiations in which BNYM threatened to sue Countrywide on repurchase claims.  The result of those negotiations was that Countrywide and Bank of America agreed, among other things, to pay $8.5 billion in settlement of the Trustee's repurchase claims.

This objector also asserts that "there is no evidence before the Court of the Trustee's analysis of total 'Put Back' liability of loans."  USDR Obj. 4.  We refer the Court to the opinion of Brian Lin, which has been available on the settlement website, www.cwrmbssettlement.com, since July 2011 (Ex. D-5 hereto).  The Lin opinion starts with statistics about actual default and delinquency rates within the Trust pools, considers various estimates for rates at which Countrywide breached representations and warranties, based on data derived from mortgage pools in Fannie Mae and Freddie Mac ("GSE") securitizations and a third-party review of 250,000 non-GSE loans, and concludes that the value of the Trusts' claims—assuming that the Trusts could prove all elements of liability and collect on any judgment—is between $8.8 billion and $11 billion.  The PSAs generally provide in Section 8.02(ii) that BNYM may rely on various types of advisors and that such advice "shall be full and complete authorization and protection in any action taken or suffered or omitted by it hereunder in good faith."  The Second Circuit has recognized that, where a trustee is authorized to rely on outside advice, even the correctness of the underlying opinion is irrelevant:  "Nor is the Trustees' good faith put in question merely by virtue of the fact that the opinion relied upon may have been wrong; to so hold would eviscerate the opinion of counsel defense."  *Cruden v. Bank of N.Y.* 957 F.2d 961, 972 (2d Cir. 1992); *Craig v. Bank of N.Y.*, 59 F. App'x 388, 390 (2d Cir. 2003) (without "evidence of BNY's actual

---

Agreement is improper because investors may have claims against the Trustee based on conduct that is unrelated to the Settlement and which the Settlement does not release.

motive for relying on [the advisor]'s advice," dispute over correctness of opinion does not show bad faith).

## IV.   Response to Objections Concerning Servicing Standards.

Some objectors contend that the servicing improvements are too vague and ill-defined and may prove harmful to investors and borrowers.  The servicing standards are far from vague.  The existing standard, in the PSAs is generally[17] that "the Master Servicer shall service and administer the Mortgage Loans in accordance with the terms of this Agreement and customary and usual standards of practice of prudent mortgage loan servicers."   PSA § 3.01; *id.* § 3.05 ("The Master Servicer shall make reasonable efforts in accordance with the customary and usual standards of practice of prudent mortgage servicers to collect all payments called for under the terms and provisions of the Mortgage Loans"); *id.* § 3.11 (as to foreclosure, "the Master Servicer shall follow such practices and procedures as it shall deem necessary or advisable and as shall be normal and usual in its general mortgage servicing activities and shall meet the requirements of the insurer under any Required Insurance Policy").   That is the full extent of the standards governing the Master Servicer's obligations under the PSAs.   BNYM made a good faith judgment that investors would be better served with the 14 pages of detailed requirements in the Settlement Agreement (not including the exhibits), than with the vague PSA standard.   BNYM acted within the bounds of reasonableness in concluding that the Settlement was a substantial improvement in servicing standards.

Among other things, the Settlement Agreement:

- Creates detailed standards for choosing eligible subservicers for servicing high-risk loans, including that the subservicer "be eligible to service in accordance with the Home

---

[17]      Some Trusts' governing documents have immaterial variations on this language.

Affordable Modification Program." SA § 5(a)(iii). By contrast, the sole requirement for subservicers under the existing PSAs is that the "subservicing arrangement and the terms of the related agreement must provide for the servicing of such Mortgage Loans in a manner consistent with the servicing arrangements contemplated under this Agreement" (§ 3.02(a)), that is, the "prudent servicer" standard noted above. The PSAs contain no eligibility requirements whatsoever.

- Gives BNYM the power to veto the selection of subservicers or to limit the number of loans allocated to a particular subservicer if BNYM believes that the subservicer is incapable of handling a greater volume. SA § 5(a)(i). By contrast, the existing PSAs leave the selection of subservicers entirely in the discretion of the Master Servicer, subject only to the consent of the "NIM Insurer"[18] (for Trusts that have such insurers). PSA § 3.02(a).

- Requires that subservicers be subject to "pool-performance incentives and/or activity-based incentives substantially similar to, and not materially less favorable than, those set forth on Exhibit E." SA § 5(a)(iv). By contrast, the existing PSAs have no requirements, or even guidelines, governing the compensation of subservicers or of the Master Servicer. In practice, subservicers have been paid flat monthly fees on each loan, a system that discourages loan resolutions that may benefit investors but would shut off the stream of servicing revenue.

- Establishes a protocol for the transfer of "High Risk Loans"—consisting of five objectively defined categories of loans—to subservicers. SA § 5(b). The PSAs have no such requirement and allow the Master Servicer to service all the loans in the pools, even though high-touch boutique subservicers may be better suited to resolve troubled mortgages. This protocol should be especially valuable to investors in light of the allegation by U.S. Debt Recovery that

---

[18]   For some trusts, a "NIM Insurer" guarantees certain payments under net interest margin ("NIM") securities that are issued by those Trusts.

the Master Servicer has engaged in wide-ranging misconduct in servicing under the current regime. USDR Obj. 7-8. The Settlement Agreement, for the first time, provides strong incentives for the Master Servicer to transfer high-risk loans to subservicing, a result that likely could not have been achieved through litigation alone.

- Requires monthly reporting of the Master Servicer's performance compared to defined benchmarks (SA § 5(c)(i), (ii)) and deducts from the Master Servicer's compensation if performance does not meet those benchmarks. The PSAs do not require reporting or benchmarking, and they do not provide for adjustments to the Master Servicer's compensation for failure to achieve performance-related objectives.

- Requires that the Master Servicer indemnify the Trusts (not the Trustee) for certain losses caused by certain documentation deficiencies. SA § 6(c).

In addition, BNYM submitted the proposed servicing standards to an expert in mortgage-servicing, who evaluated them and concluded that "this settlement can be viewed as an industry precedent setting, pro-active approach in regard to establishing a framework to enhance recovery efforts for underperforming loan pools." Ex. D-4 (Lin Servicing Opinion) at 1. BNYM was entitled to rely in good faith on this report, and reasonably determined that these servicing protocols were a valuable improvement over the status quo.

As to the specific criticisms of the loss-mitigation criteria, the Settlement, unlike the PSAs, actually describes a methodology for choosing loss-mitigation strategies. In addition, the provision permitting the Servicer to consider "such other factors as would be deemed prudent" when evaluating loss mitigation strategies, is far from vague. It is a garden-variety catch-all provision, in addition to the six factors that the servicer "shall consider," that permits the servicer to consider unique borrower circumstances in evaluating loss-mitigation strategies. It is (at least)

23

reasonable to conclude that this approach is far preferable than a straightjacket that mandates either foreclosures or modifications and prohibits the servicer from acting prudently.

Moreover, the Master Servicer's allegedly poor track record on modifications is precisely why the Settlement Agreement provides strong incentives for the Master Servicer to transfer high-risk loans to subservicers, which have the "high touch" servicing capabilities to innovate with respect to loss-mitigation programs.  Because of volume, "nimble" smaller servicers have had an easier time implementing loan modification programs. *See* Dawn Kopecki, *Bank of America Among the Worst for Loan Modifications*, Bloomberg (Aug. 4, 2009) (Ex. L hereto). The PSAs allow the Master Servicer the right to service all loans and does not require subservicing of any of them.  Without this Settlement, there would be no way to compel it to subservice loans.

Relatedly, U.S. Debt Recovery objects that "[t]he proposed Settlement addresses only 'put back' liability of Bank of America/Countrywide but wholly fails to address (but release anyway) claims relating to mortgage servicing irregularities, fraud and similar wrongdoing by Bank of America and Countrywide which liability has not been quantified by Petitioners."  USDR Obj. 6. It is unclear what the objector means by "fraud and similar wrongdoing"—if it means securities fraud, those claims are not released.  *See supra* Part III.A.  The references to "subordination [*sic*] of perjury" or "potential liability for improperly refusing to modify loans under mandated criteria since Bank of America was a beneficiary of TARP" (*id.* at 8) appear to refer to claims or charges that could be brought by the government, not claims that BNYM could recover for in litigation over the PSAs.  The Trustee's decision to release, or even its failure to consider, claims that the objectors cannot even coherently articulate does not make the settlement unreasonable.

As to "mortgage servicing irregularities," the objection gives no explanation for how the settlement "wholly fails to address" it. The objection does not even mention the servicing improvements detailed in Section 5 of the Settlement Agreement, improvements that would be impossible to achieve without a global settlement of this type.

## V.   Response to Objections Concerning the Treatment of Particular Trusts or Investors.

### A.   The Distribution of Settlement Proceeds Through the PSA Waterfalls.

The Settlement Agreement provides for each Trust's allocable share of the settlement proceeds to be distributed pursuant to the contractual priority of payments, or "waterfall," set forth in each PSA. SA § 3(d)(i). Certificateholders of particular tranches will naturally wish to increase their share of a limited pie. The Settlement Agreement merely follows the preexisting distribution formula of the PSAs, and the objections to that method therefore demand that BNYM distribute funds in a manner that the PSAs prohibit.[19] As the New York Supreme Court recently held in a similar context, noteholders "are bound by the agreements that they made." *ASR Levensverzekering NV v. Swiss Re Fin. Prods. Corp.*, Index No. 650557/09, slip op. at 7 (N.Y.Sup. Ct. N.Y. Cnty. Oct. 11, 2011); *see also Greenwich,* slip op. at 7 (holding certificateholders are bound to the terms of the PSAs "which they agreed to when they purchased the certificates").

The objections to the payment waterfall are on contradictory grounds, each evidently designed to further the interest of the objector at the expense of other investors. It is striking that these objectors simultaneously express extreme skepticism of the Trustee's right to settle claims and also presume, contrary to the express provisions of the PSAs, that BNYM has virtually unlimited discretion to distribute payments. Objectors argue that the Settlement Agreement

---

[19]    If Countrywide repurchased individual loans as required under the PSAs, the PSAs would require proceeds to be passed through the payment waterfall.

should be rejected because it fails to give priority to junior holders over senior holders, it fails to give funds to former holders, and it does not distinguish among holders based on when they purchased their securities. Even if the PSAs allowed such freewheeling distributions, the Trustee's decision to follow the agreed-upon payment waterfall surely is not outside of its discretion.

Vertical Capital contends that the servicing provisions unfairly benefit senior holders, in two ways. First, it argues that settlement proceeds should be distributed to junior holders first, because those investors have suffered the most losses. Vertical Obj. 4 ("Equity requires that the allocation of the Settlement Payment address actual losses suffered by the most adversely affected securities, and that those proceeds be applied *first* to reduce those losses."). This objection seems to suggest that BNYM should disregard the contractual payment priority. Those priorities were part of the contracts from the beginning and in any event are binding on BNYM as trustee. Contractual priorities are enforceable, and Trustee lacks the power to disregard them in order to benefit one group of investors at the expense of another. *See Bank of Am., N.A. v. AIG Fin. Prods. Corp.*, 10-cv-05242(JSR), 2010 WL 506477, at *2 (S.D.N.Y. Dec. 7, 2010) (enforcing indenture subordination provision and noting that "[t]his is, indeed, the entire point of having different classes of notes"). Vertical also alludes to being a "defrauded purchaser[]" (Obj. 3), but, as noted above, securities fraud claims are not released.

Vertical also objects that the servicing improvements will unfairly benefit senior holders by imposing performance benchmarks. Vertical Obj. 4-5. Vertical argues that these new standards will accelerate foreclosures, with the foreclosure proceeds going to senior holders, while junior holders would benefit from long-term workouts. *Id.* at 5. But Vertical fails to acknowledge that the PSAs already accord near-total discretion to the Master Servicer on the treatment of defaulted

26

loans.  *See* PSA §§ 3.01, 3.11.  Taking the interests of the whole Trusts into consideration, BNYM determined that investors would be better served by a system that creates incentives for the Master Servicer to enforce the Trusts' rights in a timely manner rather than continuing to accrue servicing fees on non-performing loans.  The Settlement's foreclosure timelines do just that:  they are based, in fact, on standards promulgated by the Federal Housing Finance Agency.[20]  The fact that junior holders may have received additional interest advances because of foreclosure delays in the past does not entitle them to the continuation of those practices at the expense of senior holders and the Trusts as a whole.  It is certainly no basis for objection to the Settlement, much less to deem the Trustee's decision to enter into the Settlement unreasonable. Indeed, the Vertical Capital objection affirmatively asserts that the holders' interests diverge (Obj. 5 ("Accelerated defaults *would benefit senior holders* . . . [but] work to the detriment of junior security holders")); accordingly, BNYM had no choice but to act in the interests of the entire Trusts.

The Policemen's Fund, by contrast, argues that BNYM should abandon the contractual payment waterfall to make payments to *former* Certificateholders and to provide some unspecified additional benefit to initial purchasers, as compared to purchasers in the secondary market.  Policemen's Fund Obj. ¶ 11.  Those contentions seem to miss the point of the Settlement entirely.  BNYM seeks to settle *contract* claims—claims that belong to the Trustee, on behalf of trust beneficiaries.  Investors who sold their interests in the Trusts are no longer trust beneficiaries and hence are not entitled to any recovery from the Trusts, whether under the PSAs or otherwise.  Again, this is not a matter in which BNYM has any discretion—it cannot simply decide to take money from current Certificateholders or Noteholders—the owners or creditors of

---

[20]     *See* SA ¶ 5(c).

the Trusts—to give it to former holders who voluntarily sold their right to recover.  Even if the

claims belonged to individual holders, New York U.C.C. Section 8-301(1) provides that all such

claims are transferred to the purchaser:

> Upon transfer of a security to a purchaser . . . the purchaser acquires the rights
> in the security which his transferor had or had actual authority to convey.

Likewise, the contracts provide no additional entitlements to original purchasers compared to

secondary-market purchasers of the certificates.   Regardless of when Certificateholders

purchased their securities, they purchased the same exact bundle of contract rights under the

PSAs.  To hold otherwise would render these securities essentially inalienable, undercutting a

fundamental principle of state and federal securities law and of the financial markets.

At a minimum, even if BNYM somehow had the power to invent its own distribution

scheme, it certainly did not exceed the bounds of its discretion in deciding to follow the existing,

agreed-upon contractual priorities.  The PSAs contain distribution procedures for the allocation

of "Subsequent Recoveries," which is how the PSAs treat loan-repurchase proceeds on

liquidated loans.  The Settlement generally provides for the distribution of a Covered Trust's

Allocable Share as though it were a Subsequent Recovery available for distribution on that

distribution date.  *See* SA § 3(d)(i).  This methodology will mean that senior holders will receive

more cash than junior holders, but that distribution system is what all Certificateholders signed

up for (and paid for) when they purchased their certificates in the trusts governed by the PSAs.

And the settlement distribution does not leave junior holders out in the cold.  The Settlement

Agreement provides for the balances of written-down tranches to be written up, in the reverse

order of prior write-downs, by the amount of cash that is allocable to the Covered Trust.  This

part of the Settlement Agreement, which is likely to result in write-ups of junior tranches, will

have the effect of allowing junior holders to receive extra interest payments going forward, and possibly extra principal payments, for as long as the balance remains outstanding.[21]

Finally, Walnut Place objects that the settlement is flawed because it does not give preferential treatment to the three trusts in which Walnut Place happened to have invested. Walnut Place asks for preferential treatment because it chose to bring separate litigations against the Trustee, Bank of America and Countrywide (rather than join in the settlement discussions that led to the Settlement) in an effort (as described by its counsel in open court) "to stop the settlement."[22]  This contention that Walnut Place's three trusts were entitled to discriminatorily favorable treatment is illogical.  The initiation of separate litigation by Walnut Place after learning of the settlement negotiations (for two of its trusts) and after announcement of the Settlement (for the third trust) does not warrant preferential treatment for the trusts in which Walnut Place holds certificates.  Walnut Place's lawsuits, which are subject to motions to dismiss by Bank of America and Countrywide, have in no way improved the Settlement (and in fact were admittedly designed purposefully to hinder it).  There is no reason why the existence of those lawsuits should entitle the three trusts in which Walnut Place holds certificates to any discriminatorily preferential treatment.

---

[21]    One of the holders of REMIC residual interests has also objected to the distribution procedures.  *See* Clayhill Investors Objection at 4 (Sup. Ct. Dkt. 180).  It is indisputable, however, that holders of REMIC residual interests agreed, when they purchased those securities, to be paid only when, and if, all other certificateholders have been paid in full.  All the Settlement Agreement does in this regard is preserve the contractual allocation between the holders of REMIC residual interest and the other holders in accordance with the PSAs / Indentures.

[22]    Ex. H (Transcript of August 5, 2011 hearing) 33:20-23.

### B.  The Demand for an "Opt Out" Mechanism Should Be Rejected.

Walnut Place and AIG both argue that BNYM has no power to "bind trust beneficiaries and prevent them from opting out of the proposed agreement."  AIG Pet. ¶ 45; *see also* Walnut Obj. 5.  This objection makes no sense.  As Justice Kapnick already stated, beneficiaries have no right to "opt out" of decisions by their trustee, any more than corporate shareholders have a right to "opt out" of decisions by the corporation.  Ex. H at 18-19.  It is telling that neither Walnut Place nor AIG cites any authority or precedent for such an opt out.  AIG points out that "[a] trustee derives its powers from the trust agreement" (AIG Pet. ¶ 46) and cites *In re IBJ Schroder Bank & Trust Co.*, 271 A.D.2d 322, 322 (1st Dep't 2000) and RESTATEMENT (SECOND) OF TRUSTS § 186 (1959)).  Both are odd choices.  *IBJ Schroder* held that

> In this matter, the same provision of the trust agreement which, the parties do not dispute, gave the trustee the power to commence the underlying action, also vests the trustee with the power to "take such action as shall be necessary" with respect to the subject matter of the underlying action. We now find that this provision includes the power to settle that action.

271 A.D.2d at 322.  On remand in that case, the New York Supreme Court did exactly what BNYM asks here—it gave judicial guidance approving the trustee's decision to settle claims that belong to the trust.  The *Restatement*, too, only six sections after the one cited by AIG, says that "[t]he trustee can properly compromise, submit to arbitration or abandon claims affecting the trust property, provided that in so doing he exercises reasonable prudence."  RESTATEMENT (SECOND) OF TRUSTS § 192; *see also id.* cmt. a ("The trustee has discretion whether to sue or to compromise claims or submit them to arbitration, if he acts within the bounds of a reasonable judgment.").  That is consistent with the powers of other trustees, for example in bankruptcy. *See, e.g.*, *In re Smart World Techs., LLC*, 423 F.3d 166, 174-75 (2d Cir. 2005) ("As legal representative, the debtor-in-possession has the power to sue and be sued on the estate's behalf, which presumably includes the derivative power to settle suits.  In other words, § 323 implies

what Rule 9019 expressly states—that it is the debtor-in-possession, as legal representative of the estate, who is vested with the power to settle the estate's claims.") (citations omitted).

The PSAs—the "trust agreement" from which AIG agrees BNYM "derives its powers"—states that "the Trust Fund . . . is hereby conveyed *to the Trustee*." PSA, Preliminary Statement (emphasis added). The PSAs are contracts among various Countrywide entities on the one hand, and BNYM on the other; the Certificateholders are not parties. The representations and warranties by the Seller and the Master Servicer are made to BNYM (PSA § 2.03(a), (b)) (not to the Certificateholders) thereby giving BNYM the ability to enforce them (*id.* § 2.01(b)). As noted above, courts have enforced these provisions to hold that trustees have the power to enforce representations and warranties in PSAs. *See* cases cited on p. 17, *supra*. These provisions accord with the general principle that a trustee, not the beneficiaries, holds legal title in the trust corpus. *See, e.g.*, RESTATEMENT (SECOND) OF TRUSTS § 3 ("The person holding property in trust is the trustee."); *id.* § 32(1) (trust created "if the owner of property makes a conveyance inter vivos of the property *to another person to be held by him in trust* for a third person") (emphasis added); *cf. In re Beiny*, No. 621-M/2502, 2009 WL 1050727, at *3 (N.Y. Sur. Ct. Apr. 20, 2009) ("EPTL 7–2.1(a) expressly provides that legal title to trust property vests solely in the trustees. Thus, neither the beneficiaries of a trust nor any one other than the trustee may validly encumber or convey legal title to property owned by a trust"; "the beneficiary does not take any legal estate in the property but may enforce the trust.").

Objectors have mischaracterized the Trustee's acts and its request for judicial direction as unusual or arcane. In fact, a trustee's power to act on behalf of the trust is unquestionable. What would be unusual—indeed, unprecedented—would be to allow individual beneficiaries, in particular a small minority, to force BNYM to act in a manner that BNYM believes is against the

interests of the Trust, where it has not been shown that the Trustee's judgment was unreasonable. It is no coincidence that the objectors can cite no authority in support of their demand for opt-out.  There is none.

### C.  The "Group Settlement"

One objector asserts that a "group settlement" is inappropriate because

> just as an attorney owes a duty of undivided loyalty to each client, and hence cannot settle individual tort claims of several clients against one insurance company by a single group settlement, neither can the Trustee settle claims of breach of warranty representations held by one RMBS trust in a group settlement of all RMBS trusts where the damages are different.  There is an inherent conflict of interest.

USDR Obj. 6.  This "group settlement" objection ignores that differences in expected damages are addressed by the distribution methodology, which allocates the $8.5 billion among the Trusts based on their actual and expected losses.  Trusts that experience greater losses receive proportionally greater amounts from the Settlement.[23]

The analogy to attorney duties is simply misguided.  For one thing, there is no prohibition on group settlements.  New York Disciplinary Rule 5-106.  More fundamentally, unlike an attorney, who acts in a representative capacity, BNYM settled claims that belonged to it, not individual investors.  *See* PSA, Preliminary Statement; Parts III.A., V.B., *supra*.

*    *    *

The lack of any better alternative, for all of the Trusts collectively, or for individual Trusts, has to be a final and key consideration in evaluating the reasonableness of the Settlement.  The PSAs do not obligate BNYM "to risk or expend its own funds or otherwise incur any financial liability" (PSA § 8.02(vi)), and BNYM accordingly is not required to incur the massive expense

---

[23]    The Settlement Agreement expressly provides that a change in the distribution methodology will not be deemed a material change to the Settlement Agreement.  SA § 3(d)(v).

of litigating for 530 Trusts, possibly on a loan-by-loan basis. And no investor, to date, has been willing to do so either. For the many investors whose holdings are too small to instruct the Trustee, or who are unwilling or unable to risk tens of millions of dollars in legal fees in uncertain litigation, the benefits of which (if any) would be shared with other investors, the alternative is the status quo. And even for Trusts as to which litigation was possible, there were significant hurdles, including the PSAs' materiality requirements (*see* Ex. D-1) and successor liability (*see* Ex. D-2), leaving a significant risk of recovering little or nothing in cash and the near-certainty that servicing improvements would not be realized. The Settlement Agreement does not single out individual Trusts or investors; indeed, the failure to grant such preferential treatment is the motivation for several objections. With 530 Trusts, BNYM and the Institutional Investors were able to win concessions that would have been impossible otherwise, including an agreement that Bank of America, and not just Countrywide, would contribute to the Settlement Payment. A global settlement also made possible wide-ranging improvements in the Master Servicer's servicing practices, which could not have been implemented on a trust-by-trust basis and could not have been won in litigation. BNYM determined that it was in the best interests of the Trusts to obtain servicing improvements and document-deficiency indemnities that apply equally to all Trusts, collect the largest aggregate cash settlement possible, and then distribute that cash across the Trusts proportionally to each Trust's past and expected losses. The Court should find that that the Trustee's judgment was reasonable.

## **CONCLUSION**

For all of the foregoing reasons, the Court should approve the Proposed Final Order and

Judgment.

Dated:   New York, New York
         October 31, 2011

                                            /s/ Matthew D. Ingber
         DECHERT LLP                        MAYER BROWN LLP
         Hector Gonzalez                    Jason H.P. Kravitt
         James M. McGuire                   Matthew D. Ingber
         1095 Avenue of the Americas        1675 Broadway
         New York, New York 10036           New York, New York 10019
         (212) 698-3500                     (212) 506-2500

                        *Attorneys for Petitioner*
                        *The Bank of New York Mellon*